Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| LARGAN PRECISION CO., LTD., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | NO. C 13-2502 JD |
| ) | |
| GENIUS ELECTRONICS OPTICAL ) | |
| CO., LTD., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Francisco, California
Wednesday, March 18, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    PERKINS COIE LLP
                    11988 El Camino Real, Suite 350
                    San Diego, CA 92130-2594
            BY:  **JOHN P. SCHNURER**
                 **JOHN ESTERHAY**
                 **JOSEPH REID**
                 **MICHAEL ENGLE**
                 **ATTORNEYS AT LAW**

For Defendants:
                    KILPATRICK, TOWNSEND & STOCKTON LLP
                    1400 Wewatta Street, Suite 600
                    Denver, CO 80202-5556
            BY:  **DAVID SIPIORA**
                 **KRISTOPHER REED**
                 **JEFFREY MATTHEW CONNOR**
                 **ATTORNEYS AT LAW**

Reported By:        Rhonda L. Aquilina, CSR #9956, RMR, CRR
                    Court Reporter

1    <u>**Wednesday - March 18, 2015**</u>                        <u>**11:15 a.m.**</u>

2                        P R O C E E D I N G S

3                            ---oOo---

4        **THE CLERK:**  Calling civil 13-2502, Largan Precision

5    Company Limited versus Genius Electronic Optical Company

6    Limited.

7        Counsel.

8        **MR. SCHNURER:**  John Schnurer representing the

9    plaintiff Largan Precision.  With me is Joe Reid, Mike Engle

10   and John Esterhay.

11       **MR. SIPIORA:**  Good morning, your Honor.  David Sipiora

12   from Kilpatrick, Townsend representing Genius Electronic

13   Optical.  With me is Kristopher Reed and Jeffrey Connor.

14       **THE COURT:**  All right.  Okay.  You all have a slew of

15   motions.  I am taking all but the cross-motions for summary

16   judgment on infringement under submission pursuant to Rule

17   71(b).

18       Let's -- so there are cross-motions that mainly repeat

19   each other, so we're just going to treat them as one summary

20   judgment motion on infringement, and one in opposition.

21       Let's see, Mr. Schnurer?

22       **MR. SCHNURER:**  Yes.  Yes, Your Honor.

23       **THE COURT:**  I am struggling with why this is not an

24   improper extraterritoriality exercise with U.S. patent law.

25       So I am not persuaded that the MDSA or the SOW with Apple

1   do anything more than set ballpark expectations on price and

2   quantity.   They do not in my view constitute a binding

3   contract.

4          I'm sorry.   Can you turn that down?

5                         (pause in proceedings.)

6          **THE COURT:**   -- A binding contract for sale.   It does

7   not look to me like the offer for sale was in the U.S. either.

8          So you could start with those two, and then we're going to

9   move on to what I think is the main event, and that is whether

10  what Genius introduced is -- I think we would all call it

11  samples -- would constitute import.

12         But let's start with offer for sale and sale first.

13         **MR. SCHNURER:**   All right.   Your Honor, may I approach

14  your Honor to hand you some slides?

15         **THE COURT:**   Okay.

16         **MR. SCHNURER:**   May I approach your clerks?

17         **THE COURT:**   Yes.

18         **MR. SCHNURER:**   I have two more copies.

19         So let me address your first point, your Honor, with

20  respect to whether the MDSA and the Statement of Work combined

21  with all other agreements between the purchase orders

22  constitutes a sale, or conversely an offer for sale.

23         And let me just direct you to slide six, because this is

24  what gets us our point.   The briefs have articulated, and all

25  the parties agree, that the MDSA is an executed document signed

1    by both parties, Genius and Apple, and it incorporates also the

2    Statement of Work, which provides pricing and quantity

3    information.  The pricing information is "not to exceed"

4    amounts.  And the quantities are a requirement concerning

5    capacity commitments.

6         So within the Statement of Work in the MDSA, it provides

7    an arrangement between Genius and Apple similar to the

8    agreement that you have in the *Mediatek* case between *Freescale*

9    and *AFS*.  And there, they had a similar agreement, just like we

10   have here in the MDS and this Statement of Work.  It was not

11   the general agreement that you had in the *Halo* case.

12        The general agreement case sounded like what you just

13   articulated, your Honor.  It's just a general agreement with

14   respect to the business relationship between those two parties.

15        **THE COURT:**  Well, I don't agree with you.  I mean, the

16   MDSA and the SOW, both of which I looked at, don't set any

17   binding requirements on Apple to buy anything from Genius.

18        Cite to me the paragraph in either of those documents that

19   says that Apple is obligated to purchase anything from Genius.

20        **MR. SCHNURER:**  The agreement does not say Apple is

21   obligated to purchase.

22        **THE COURT:**  And it does not say that Genius is

23   obligated to supply.

24        **MR. SCHNURER:**  No, but what it does --

25        **THE COURT:**  It does not say that; is that right?

1        **MR. SCHNURER:**  It does not say that, but --

2        **THE COURT:**  All right.  So it is not a binding

3   contract for sale.

4        Genius could have signed both of these documents and a

5   week later called them up and said, you know what, call up

6   Apple and say we're not going to provide any lenses.  And Apple

7   would have said fine.  And you agree they would not have had a

8   cause of action for breach under the SOW or the MDSA.

9        **MR. SCHNURER:**  So --

10        **THE COURT:**  Answer that question.  Apple would not

11   have had a cause of action for breach against Genius under the

12   SOW or MDSA if Genius decided not to provide any lenses at all.

13        **MR. SCHNURER:**  I disagree with that, your Honor.

14        **THE COURT:**  Tell me where -- what provision says

15   Genius is in breach if it failed to provide any lenses to

16   Apple.

17        **MR. SCHNURER:**  The Statement of Work defines the

18   capacity commitment that Genius was obligated to be prepared to

19   provide if an event happened --

20        **THE COURT:**  Well, that's what I'm saying.

21        So they call up and say we changed our mind.  We're not

22   going to be prepared to provide anything going forward.

23        Look.  What that clearly means is if Genius chooses to go

24   forward, Apple has this expectation.  If Genius chooses not to

25   go forward, Apple can't sue Genius for breach; right?

1              **MR. SCHNURER:**  Well, but your Honor -- well, the MDSA

2    includes -- the agreement here between the parties, between

3    Genius and Apple, constitutes the MDSA, the Statement of

4    Work --

5              **THE COURT:**  Wait, counsel, we'll get through the

6    weeds.

7              **MR. SCHNURER:**  Sure.

8              **THE COURT:**  I'm asking you to tell me where in the

9    agreement it says -- and you've already answered this question

10   no, it doesn't say it -- where does it say Apple is required to

11   buy anything from Genius, or Genius is required to supply

12   anything to Apple?  It's not there.

13         I'll give you thirty seconds to give me the cites to the

14   clauses in your agreement that tells me that I'm wrong.

15             **MR. SCHNURER:**  Sure.  The MDSA and Statement of Work

16   also includes the purchase orders, and it's not disputed that

17   they're purchase orders.

18             **THE COURT:**  Cite to me the clauses.  Don't narrate.

19             **MR. SCHNURER:**  I'm sorry, your Honor.

20             **THE COURT:**  This is a summary judgment.  Cite me the

21   evidence.  Give me the evidence.

22             **MR. SCHNURER:**  Well, in Exhibit 8 -- well, let me

23   just -- slide seven of our slides dictates or outlines all the

24   requirements of Statement of Work that provides --

25             **THE COURT:**  I don't want your slides.  I want the

1   agreements.

2          **MR. SCHNURER:**  All right.  Then Exhibit 19, I'll

3   direct your attention to, of Largan's Motion for Summary

4   Judgment is an example of a Statement of Work.

5          **THE COURT:**  Exhibit 9?

6          **MR. SCHNURER:**  Exhibit 19, your Honor.

7          **THE COURT:**  Why don't you use Exhibit 9.

8          **MR. SCHNURER:**  Pardon?

9          **THE COURT:**  Use Exhibit 9.

10         **MR. SCHNURER:**  Exhibit 9.  Your Honor, Exhibit 9 is a

11  deposition.

12         **THE COURT:**  Exhibit 9 is GSEO-18143 to 145, caption is

13  Statement of Work Under the MDSA.  This is a document cited in

14  the briefs.

15     Now, tell me where in this SOW it says that Apple is

16  obligated to buy anything from Genius.

17         **MR. SCHNURER:**  Well, your Honor, it's -- 4.1 is the

18  capacity commitment, and then that's read in light of the MDSA

19  in terms of the -- the terms that they --

20         **THE COURT:**  All it says is supplier agrees to have the

21  following capacity available for the goods described above.

22     Where does it say Apple is required to buy these devices

23  from Genius?  It doesn't say it, counsel.  And the MDSA doesn't

24  say it either.

25     So I just, you know, you're falling around a bit.  I don't

1  see any basis for saying that there was ever an agreement for

2  sale within the meaning of 271(a) between Apple and Genius.

3       And isn't it also the case that Apple never directly

4  purchased anything from Genius?

5           MR. SCHNURER:  Apple purchased through -- the MDSA

6  defined the relation --

7           THE COURT:  Answer my question.  Focus on my question.

8           MR. SCHNURER:  Okay.

9           THE COURT:  I have limited time.  I went over on

10 another case, and you're going to have to work with me and do

11 it my way.

12          MR. SCHNURER:  Okay.

13          THE COURT:  Is it the case, isn't it true that Apple

14 did not purchase anything directly from Genius?

15          MR. SCHNURER:  I disagree with that.

16    The samples are purchased in their acts of importation.

17 There were invoices --

18          THE COURT:  I thought they were free samples.

19          MR. SCHNURER:  Well, invoices were submitted, your

20 Honor, and the consideration paid for those at the time --

21          THE COURT:  Weren't those free samples?  Weren't there

22 700 samples?

23          MR. SCHNURER:  You're right about that, your Honor.

24          THE COURT:  Out of how many millions of lenses that

25 you say Genius provided?

 1          **MR. SCHNURER:**  Hundreds of millions.

 2      But you asked me for an example, your Honor.  I provided

 3  you with an example.

 4          **THE COURT:**  All right.  So your only example regarding

 5  the samples, whether they're free or not, I guess you disagree,

 6  but --

 7          **MR. SCHNURER:**  Well, your Honor, the MDSA defines --

 8  Apple dictates the supply chain, and so Apple does purchase the

 9  agreements.

10      Now, Mr. Leopold, Apple's witness, said --

11          **THE COURT:**  Counsel, Apple says if you want to play,

12  here are the rules.  It doesn't say you are obligated to

13  deliver this quantity to me at this price, and if you fail to

14  deliver that, I will sue you for breach.  They don't say that.

15      The SOW and the MDSA are relatively standard commercial

16  agreements saying here are the rules of the road.  You want to

17  do it, you want to have a business proposition with us, here's

18  what you're going to have to do.  But it doesn't give Apple a

19  firm, definite commitment to get lenses from Genius, and it

20  doesn't give Genius a firm and definite commitment to deliver

21  anything to Apple and for both sides to sue each other.

22      Now, what's going on with the offer to sell?

23          **MR. SCHNURER:**  Well, just one more comment there.

24      But in execution of the agreement, purchase orders are

25  submitted, quantity is supplied to the Apple supply chain.

1          **THE COURT:**  Who submits the purchase orders?

2          **MR. SCHNURER:**  It's the Apple affiliates.

3          **THE COURT:**  Yes.  It's not Apple.

4          **MR. SCHNURER:**  But it's Apple affiliates designated as

5     an Apple affiliate under the MDSA.

6          **THE COURT:**  It's not Apple.  It's another company that

7     submits the POs.

8          **MR. SCHNURER:**  All right.  Your Honor, the MDSA and

9     the Statement of Work also constitutes an offer for sale, and

10    the law is clear where if the contract --

11         **THE COURT:**  Answer my question.

12    The purchase orders are not submitted directly by Apple to

13    Genius; right?

14         **MR. SCHNURER:**  The purchase orders are from the camera

15    module integrators, or Apple affiliates, and they in turn get

16    purchase orders from system integrators who are Apple

17    affiliates, and they in turn get purchase orders from Apple.

18    So Apple initiates this --

19         **THE COURT:**  So why don't you move on to the offer for

20    sale.

21    Now, to the extent there were negotiations, weren't those

22    just the SOW in the U.S. and all the other action happened

23    outside of the United States?

24         **MR. SCHNURER:**  Pardon, your Honor?

25         **THE COURT:**  And all the other action happened outside

1   the United States?

2           MR. SCHNURER:  Regarding the offer for sale?

3           THE COURT:  Yes.

4           MR. SCHNURER:  The MDSA and the Statement of Work

5   constitutes the offer for sale, and those negotiations occurred

6   in the United States and also in Taiwan, at least with respect

7   to employees who were in Taiwan at Genius.  But Genius also has

8   an office in Cupertino.

9           THE COURT:  But you know the offer for sale in case

10  law in the federal circuit says it's the location of the

11  contemplated sale.  The contemplated sale is not in Cupertino.

12  It was overseas in Asia.

13          MR. SCHNURER:  Well, your Honor, the contemplated sale

14  is defined by the offer for sale, and the offer for sale is

15  defined in the four corners of the offer for sale is the MDSA

16  and the Statement of Work.

17      And the MDSA and the Statement of Work identifies -- the

18  only authorized purchaser by name is Apple or an Apple

19  affiliate.  There is no Apple affiliate that's designated at

20  that point in time anyone else.  So the only -- at that point

21  in time, the contemplated sale and the four corners of the

22  offer for sale is Apple.  And, in fact, it's shown to be Apple,

23  because they obtained samples, and those samples are purchased

24  through the invoice.

25      So your Honor, you've got to look at the offer for sale at

1   the point in time the offer for sale is made.   The contemplated

2   sale was Apple.   No other affiliate, nobody in the supply chain

3   was identified.

4       **THE COURT:**   Well, my colleague Judge Armstrong

5   disagrees, and she held, in the *Ziptronix* case, which I found

6   to be persuasive, that in order for an offer to sell to

7   constitute infringement it must be -- there has to be an offer

8   to sell a patented invention within the United States.   The

9   focus should not be on the location of the offer, but, rather,

10  the location of the future sale that would occur pursuant to

11  the offer.

12      The four corners that you're referring to do not draw the

13  conclusion.   The location of contemplated sale controls whether

14  there is an offer to sell within the United States.

15      **MR. SCHNURER:**   That's right.

16      **THE COURT:**   As I understand it, the offer is for --

17  the location of the contemplated sale is all outside the U.S.

18      **MR. SCHNURER:**   No, your Honor.   You are relying on

19  acts after the offer for sale to substantiate that position.

20      The offer for sale, which stated in the MDSA and in

21  Statement of Work does not indicate that the contemplated sale

22  is outside the U.S.   The offer for sale -- at that point in

23  time the only identified party was Apple, and the only

24  identified party's address for Apple is in Cupertino in

25  California.

1          **THE COURT:**  Well, you're just standing on the SOW and

2    the MDSA and not reacting to what I just referenced.

3        Mr. Sipiora, on the offer for sale issue --

4          **MR. SIPIORA:**  Offer for sale is decided by the

5    *Transocean* case, and *Ziptronix* follows that.  *Halo versus Pulse*

6    also confirms that the *Transocean* standards is what apply.

7    Quote, we agree -- this is the Federal Circuit saying in

8    *Transocean* -- (reading) we agree that the location of the

9    contemplated sale controls whether there is an offer to sell

10   within the United States, end quote.

11         **THE COURT:**  Now, you have represented that all of the

12   locations that contemplated sales were in Asia; right?

13         **MR. SIPIORA:**  Absolutely.

14         **THE COURT:**  Okay.

15         **MR. SIPIORA:**  All of the activity, the -- well, you

16   just heard it from counsel.  We sell to module integrators,

17   guys -- people who make cameras who take our lenses, assemble

18   them with image sensors and other components to make cameras,

19   which are then sold to system integrators which integrate the

20   cameras into other aspects of the phone.

21         **THE COURT:**  All outside the U.S?

22         **MR. SIPIORA:**  All in Asia.  And then those are sold to

23   Apple and whomever else, and distributed around the world.

24         **THE COURT:**  And this is hundreds of millions of

25   lenses, to your knowledge.

1          **MR. SIPIORA:**  Hundreds of millions of lenses, yes,

2    Your Honor.

3          **THE COURT:**  Now, you did send 700 or so lenses, I

4    think; is that the right number, 700?

5          **MR. SIPIORA:**  700 -- yeah, low 700s, 702, something

6    like that.

7          **THE COURT:**  What was the purpose of those deliveries?

8       First of all, was that directly from Genius to Apple in

9    the U.S.?

10          **MR. SIPIORA:**  I'm sorry.  I didn't hear.

11          **THE COURT:**  Was that directly from Genius to Apple in

12    the United States?

13          **MR. SIPIORA:**  It was -- it was shipped out of Asia

14    from Genius to Apple in the United States.

15          **THE COURT:**  So that was a direct Genius and Apple

16    delivery of lenses?

17          **MR. SIPIORA:**  Yes, it was a shipment to them.  And

18    there were multiple shipments.

19          **THE COURT:**  All right.

20          **MR. SIPIORA:**  And under the Statement of Work, the

21    MDSA, or quickly the Statement of Work, Apple has a right to

22    request samples, and it's in our brief.  We describe that

23    contractual provision.  And testimony came from Apple's

24    representative as well that they have a right to request

25    samples.  Those samples are free, and they're used for testing

```
 1   purposes.
 2        And in this case -- which is exactly the same thing as
 3   the --
 4            THE COURT:  Let's pause on that.
 5        So your opponent tells me that in fact you billed Apple
 6   for the lenses.
 7            MR. SIPIORA:  No, those lenses are free.  There are --
 8   the shipment --
 9            THE COURT:  Give me a record cite for that, something
10   that clearly says here are the lenses, there's no charge to
11   Apple.
12            MR. SIPIORA:  I'd have to find it, your Honor.
13            THE COURT:  Maybe one of your colleagues can look for
14   that.  But I want a pin cite in the evidence for that.
15            MR. SIPIORA:  Okay.
16            THE COURT:  And Largan, if you have a pin cite
17   contrary to Mr. Sipiora, get that ready, too.
18            MR. SCHNURER:  Yes, Your Honor.
19            THE COURT:  All right.  Let's move on to the inquiry
20   issue.  And I think the case law is a little bit less clear on
21   that.
22        So Mr. Sipiora, why is the fact that Apple sent these
23   lenses directly -- I mean, Genius sent these lenses directly to
24   Apple, I mean, why isn't that an import act such that liability
25   would rise --
```

1          **MR. SIPIORA:**  Okay.  So we agree that there's not a

2    large amount of law.  We certainly don't have a federal circuit

3    *Halo* case or on point with this one.  But the case that is

4    there, the *Cybiotronics* case from the Southern District of

5    California, and the language that they're citing, common sense,

6    there is a difference between import and export.  Congress

7    clearly knows the difference.  There's a 271(g) statute that

8    speaks to importation/exportation, particularly importation of

9    a product.

10         In this particular context it is undisputed that Apple

11   calls for samples periodically, for them and for us, under the

12   contract; and under that contract, we send samples periodically

13   as demanded, according to their needs, to the United States.

14   It is exported from Asia and imported by Apple in the United

15   States.  There is no evidence that Genius is on the receiving

16   end bringing those into the United States.  They're given

17   instructions.  They ship those.  They are for free, and they go

18   to Apple.

19         **THE COURT:**  Well, where are they literally delivered

20   to?

21         **MR. SIPIORA:**  I believe they're delivered to the Bay

22   Area.

23         **THE COURT:**  But to who, to Apple?

24         **MR. SIPIORA:**  Apple.

25         **THE COURT:**  Directly to Apple?

1          **MR. SIPIORA:**  Yeah.  I mean, there are samples that go

2     to the module integrators.  We're not talking about those.

3          **THE COURT:**  No, I'm just talking about --

4          **MR. SIPIORA:**  No, I understand.  Just to be clear,

5     there are lots of samples.

6          **THE COURT:**  So there's no Genius on -- in other words,

7     Genius in Asia does not ship the sample into the U.S. to a

8     Genius representative in California.

9          **MR. SIPIORA:**  No, it does not.

10          **THE COURT:**  To the United States.

11          **MR. SIPIORA:**  No.  My understanding is they ship to

12     Apple.  And it's Apple request that precipitates this.  This is

13     part of Apple's control over the process.

14       So in that context, Apple is asking for it -- it's just

15     like *Cybiotronics*.  Apple is asking for samples.  They are

16     provided with those samples.  They are exported by Genius and

17     imported by Apple, and it's very much on all fours with the

18     analysis of *Cybiotronics*.

19          **THE COURT:**  All right.  *Halo* doesn't analyze a strong

20     case, I think, that Genius does not address directly imports,

21     although tantalizingly it makes reference to the fact that the

22     defendant shipped samples to the United States.

23          **MR. SIPIORA:**  It did, there's no question.  And that

24     was not a factor that caused the Court going in a different

25     direction.  There's no question.

1          **THE COURT:**  Well, all things considered, I mean, I

2     think *Halo* has left this open.

3          Do you know of any case, other than *Cybernetics* that

4     directly addresses the import clause in a situation like this?

5          **MR. SIPIORA:**  We do not.

6          **THE COURT:**  All right.  Mr. Schnurer, did I get it

7     right?

8          **MR. SCHNURER:**  So his -- yes, Your Honor.

9          So the case they rely upon, it involves an intermediary, a

10    third party.  So when someone says I shipped the goods, they

11    shipped the goods -- you're talking about the case in which the

12    third party is in Hong Kong.

13         **THE COURT:**  Yeah, I'm looking at it.  That's why I was

14    wondering.

15         **MR. SCHNURER:**  So they ship to another party in Hong

16    Kong, and that other third party shipped it into the U.S.  That

17    third party shipped it into the U.S.

18         Here --

19         **THE COURT:**  I'm with you on that.  But I'm wondering,

20    though, on the direct -- so here, Genius agrees that it shipped

21    directly to Apple.

22         **MR. SCHNURER:**  Yes, Your Honor.

23         **THE COURT:**  Do you know any case on import that deals

24    with that fact pattern?  I didn't see one in the briefs.

25         **MR. SCHNURER:**  No, your Honor, other than what import

1  means.

2       THE COURT:  All right.  Okay.  So that issue I'm going

3  to have to deal with.

4       But let's assume, for the sake of the next discussion on

5  indirect infringement, let's assume that I find that Genius is

6  not a direct infringer.

7       So if they, as a matter of law, statutory construction

8  applied to the facts, can't be deemed a direct infringer, is

9  there another direct infringer that Largan has lined up?

10      MR. SCHNURER:  Yes, your Honor, Apple and Motorola.

11      THE COURT:  Apple and Motorola would be deemed direct

12  infringers?

13      MR. SCHNURER:  Yes, for the lens supply that -- into

14  the Apple supply chain for Apple products, and to the lens

15  supplied to Motorola for the Motorola products.

16      They don't overlap in terms of the lenses.

17      THE COURT:  I take it you've not sued Apple and

18  Motorola.

19      MR. SCHNURER:  No, your Honor.

20      THE COURT:  Okay.  All right.  So you're going to say

21  your customers -- they're your customers, right, who would be

22  the direct infringers next in line, so to speak.

23      MR. SCHNURER:  Yes, Your Honor.

24      THE COURT:  All right.  So in that case, for

25  inducement, I just -- I have to say I did not see a

1    particularly persuasive body of evidence that Genius did

2    anything to actively induce -- actively induce infringement by

3    Apple or Motorola.

4        I mean, first of all, the goods -- other than these three

5    lenses -- are not even going directly from Genius to Apple or

6    Genius to Motorola.  They're going through intermediaries.  So

7    where is the evidence that Genius reached out to Apple, let's

8    just stay with Apple, and actively encouraged Apple to

9    infringe?

10       **MR. SCHNURER:**  Okay, your Honor.  So the MDSA and the

11   Statement of Work is the contract in which Genius reached out

12   to Apple and vice versa to form a business relationship so that

13   Genius can supply the lenses that would be incorporated in

14   Apple's products.  Genius wanted that business.  And so Genius

15   designed a lens pursuant to the specification, which is called

16   the ERS, an Engineering Requirement Specification, that was

17   provided by Apple, and they designed the lens so that it could

18   be used by Apple in its products.

19       **THE COURT:**  Yes, but that's the issue.

20       So Apple told Genius what to do if Genius wanted to supply

21   a lens, okay.  So that's flowing from Apple to Genius.

22       **MR. SCHNURER:**  They didn't tell them how to design it.

23       **THE COURT:**  What's flowing from Genius to Apple that

24   is actively inducing Apple to infringe?

25       **MR. SCHNURER:**  "Use my lens design, Apple."

1          **THE COURT:**  Well, where is the evidence of that?

2     Where does it say that?

3          So you cited the MDSA and the SOW.  What else do they use?

4     Their email?

5          **MR. SCHNURER:**  The Engineering Requirement

6     Specification.

7          **THE COURT:**  Let me finish.

8          Is there an email?  Is there deposition testimony?

9          I mean, you're citing to me two agreements, the SOW and

10    the MDSA.  What else are you relying on to show there's

11    evidence that Genius actively induced Apple to infringe?

12         **MR. SCHNURER:**  Sure.  For example, deposition

13    testimony from a Genius Vice-President of Technical Sales Matt,

14    Matthew Bone.  And I have it on slides starting at slide 15,

15    your Honor, and it goes to slide 17, and it talks about how

16    they intend to have Apple use their lenses, and how those

17    lenses intend to be incorporated in Apple products.

18         **THE COURT:**  Well, but this goes to what I was saying a

19    minute ago.  The witness is saying we design lenses to meet

20    Apple's requirements.

21         All right.  I get it.  Apple told Genius if you want to

22    play on cameras, your lens has got to look like this.  I'm with

23    you on that.

24         **MR. SCHNURER:**  Yes.

25         **THE COURT:**  But that's not Genius actively inducing

```
 1   Apple to infringe.
 2        Apple says here are our specs.  Genius says, we'll meet
 3   them.  That cannot possibly be enough of an act of inducement
 4   for infringement.
 5             MR. SCHNURER:  Well, Your Honor --
 6             THE COURT:  What case says that that's enough?
 7             MR. SCHNURER:  Well, the cases say that you have
 8   knowledge of infringement, and that you have knowledge that the
 9   inducing acts are -- constitute infringement.  And we gave them
10   that notice, but yet they still continued to supply lenses that
11   infringe the patents, knowing that the lenses infringed.
12        They didn't tell -- there's testimony where they didn't
13   tell Apple not to sell Apple products in the U.S., that
14   included a Genius lens.  We have testimony concerning that.
15   That is a willful blindness concerning their knowledge with
16   respect to that the lenses infringed.  They did not tell Apple
17   not to.
18        Vice versa.  Apple told them that never instance -- in any
19   instance did they ever tell them we're only supplying our
20   products with only Largan lenses, for example.  That is fact in
21   the testimony that indicates that there is encouragement of
22   Apple to use their lenses.  They never told Apple not to use
23   their lenses in products that are sold into the U.S.
24        And Apples doesn't --
25             THE COURT:  Well, what case says you can simply be
```

1   aware that you may be infringing?  And there's a disputed fact

2   about that.  I mean, you're not going to get summary judgment

3   because of that alone.  I mean, they say that they did not

4   believe, and you say that they should have known, and that's a

5   disputed factual issue of whether they were aware.  But let's

6   get past that.

7          Let's assume that the evidence shows definitively that

8   Genius was guilty as sin and knew from day one that they were

9   infringing.  That's not enough under the case law to say that

10  that constitutes active inducement.  Because they did business

11  with somebody knowing they're infringing doesn't meet the

12  second part or the third parts of the test, which is they have

13  to actively induce the direct infringer or someone else to be

14  an infringer.

15         And just saying they meet your specs, I don't see any case

16  that says that alone, that tiny little act is enough to make

17  you liable for inducement.

18         **MR. SCHNURER:**  Well, your Honor, the design is what

19  infringes, not meeting the specification.

20         Meeting the specification -- you can come up with a design

21  that doesn't infringe Largan's patents and meet the

22  specification.

23         The issue here is they came up with a design and told

24  Apple to use their design in Apple's products, and this is

25  after Largan already gave Genius notice that Genius's design

1    infringes its patents.  And yet Genius continued to sell and

2    encourage Apple to continue using Genius lenses in its

3    products.

4        That's enough evidence for a reasonable jury to conclude

5    that there is active inducement and active encouragement by

6    Genius with respect to Apple.

7            THE COURT:  Mr. Sipiora?

8        MR. SIPIORA:  There is no evidence of active

9    inducement for the reasons you've stated.

10       The context is that in the process that both parties

11   engaged in, Apple sets forth what it wants.  The parties then

12   develop their proposal in order to meet that spec, and then

13   they work with Apple, according to Apple's guidance, to arrive

14   at what Apple dictates will be the end design.

15       Now, both parties are involved in designing, clearly, but

16   they're designing to a spec very tightly controlled.  There are

17   requirements for them.

18       And there is no situation in which they point to any

19   evidence that Genius does anything to actively induce.  What

20   we're talking about here is actively inducing someone to import

21   into the United States.

22       The testimony is clear that Genius doesn't care what

23   happens to those lenses after they sell them to the module

24   integrator.  If they satisfy the requirements, which the module

25   integrators are enforcing and buy those products -- there's an

1   invoice.  There's a purchase order for the module integrator --

2        **THE COURT:**  Well, you would have to be turning an

3   unusually large blind eye to the fact that those lenses are

4   likely to end up in the U.S., the largest single market for

5   Apple products.

6        It seems -- it defies reasonable commercial expectations

7   to say, in Taiwan, well, I don't know where these are going,

8   but I have a strong feeling they won't end up in the U.S.  I

9   mean, that's not going to fly.

10       **MR. SIPIORA:**  Well, the standard in *Global-Tech*, which

11  is the Supreme Court case that created this recently, very

12  recently, 2011, talks about willful blindness.  It kind of

13  grafts on some of the criminal concepts.  And it says:

14  (reading) The test is the defendant must subjectively believe

15  that there is a high probability that a fact exists.

16       That's point number one - a high probability that a fact

17  exists.

18       **THE COURT:**  All right.  You said that there is a high

19  probability of fact that if you're making a lens for an iPod,

20  an iPad, or an iPhone, it's going to end up in the U.S.

21       **MR. SIPIORA:**  The defendant must, in the second

22  sentence --

23       **THE COURT:**  Right?  How could anybody reasonably

24  conclude that that would be a low probability?

25       **MR. SIPIORA:**  Because there are millions of lenses,

1  and they're -- the supplies are around the world.

2      **THE COURT:**  Well, candidly, they're the single biggest

3  market in the world, is the United States.

4      **MR. SIPIORA:**  When you say the single biggest, but the

5  United states isn't even half.  I mean, the rest of the world

6  is a bigger market than the United States.  So when you look at

7  the volume, our products can be shipped anywhere else.

8      The decision made on that is something they could have

9  sought discovery on, and they could have gone to the system

10  integrator.  They could have asked those questions.

11      But the second part of the test is the part that's more

12  relevant here, the *Global-Tech*:  (reading) Defendant must take

13  deliberate steps to avoid learning of that fact.

14      And some of the case law that we cite talks about the

15  difference between deliberate steps, reckless, and negligence.

16  There is no evidence in this record that Genius took deliberate

17  steps to avoid learning about the whereabouts of those lenses.

18  And, in fact, the testimony that we have in the record from

19  Mr. Leopold, from Apple is that Apple doesn't know.

20      **THE COURT:**  Well, why isn't this a fact issue?  I

21  might have to decide this right now.

22      Your opponent says, you know, there's enough to go to a

23  jury on whether Genius knew or should have known, and whether

24  it actively induced.  I don't find the evidence particularly

25  strong either way.

1    Why am I making this call now?  Why not just have a jury

2    trial on it?

3         **MR. SIPIORA:**  All right.  Well, there's a preliminary

4    issue I'd like to get to, which is the actual Apple product.

5    We jumped over the question of their testimony of their expert.

6    We said she had not done an analysis of the Apple/Motorola

7    products.  It's in our brief at page 4 and 5.  She stated under

8    oath that she has not done an analysis of infringement with

9    respect to Apple or with respect to Motorola.

10        **THE COURT:**  On whether they're a direct infringer.

11        **MR. SIPIORA:**  Right.  There's no evidence in this

12   record that there's direct infringement.

13        **THE COURT:**  They carry that burden.  They're going to

14   have to show that.

15        **MR. SIPIORA:**  Well, they haven't shown it on summary

16   judgment, is my point.  We moved for summary judgment, and it's

17   in part.  One of the grounds was they haven't shown underlying

18   direct infringement.  They have that burden.  They have not --

19        **THE COURT:**  Okay.  But you allege in the Complaint

20   that Apple is a direct infringer, Mr. Schnurer?

21        **MR. SCHNURER:**  I believe so, your Honor, we did, as

22   well as in our infringement contentions.

23        **THE COURT:**  You don't believe so.  Did you or not?

24   Help me out.

25        **MR. SCHNURER:**  We did.  I had it confirmed.  Yes, we

1  did.

2      **THE COURT:**  So you allege in the Complaint that Apple

3  is a direct infringer?

4      **MR. SCHNURER:**  Yes.

5      **THE COURT:**  All right.  So how are you going to prove

6  that up?

7      **MR. SCHNURER:**  That there's a direct -- first of all,

8  they mention our expert Dr. Julie Bentley.  She did provide

9  testimony concerning that the Genius lenses incorporating Apple

10  products meet every limitation of the claims.

11      Is she a legal expert?  No, she's not.  So the ultimate

12  legal conclusion, with respect to whether there is

13  infringement, that's for the jury to decide it and your Honor

14  to decide.  She did provide testimony concerning the underlying

15  technical limitations.

16      With respect to direct infringement by Apple --

17      **THE COURT:**  Wait.  Just let's pause on this, because

18  the commentary in the briefs you guys did that somebody --

19  maybe it was the other guy whose name I never get right, Mr --

20      **MR. SIPIORA:**  Barbastathis.

21      **THE COURT:**  That's your office.  That's Genius's

22  expert.

23      **MR. SIPIORA:**  Genius's expert, yes.

24      **THE COURT:**  Yes.  So there's somebody who is somewhere

25  that's named on the plaintiff's side, the expert did not opine

1    on direct infringement by Apple or Motorola; you're saying

2    that's wrong.

3              **MR. SCHNURER:**  That is wrong, your Honor.

4         Her testimony -- because technical experts can't opine on

5    the legal conclusions.

6              **THE COURT:**  Counsel, don't tell me what the standards

7    are.  I know that.  I'm asking you evidentiary questions, okay?

8              **MR. SCHNURER:**  Yes, Your Honor.

9              **THE COURT:**  I don't need your tutorials on what the

10   law says.  I do that for you.

11        Now, you tell me what the evidence is.  I know who reaches

12   the ultimate decision in this case.  I'm not asking you to

13   opine on that.  I'm telling you just point to me to the

14   evidence so I can decide the summary judgment issue.

15             **MR. SCHNURER:**  Yes, Your Honor.  It's in the slides

16   which has her testimony on slide 21 from her deposition:

17        "Q.  Those accused products get incorporated into Apple

18        and Motorola devices; is that right?

19        "A.  They are.

20        "Q.  So would the Apple and Motorola products listed in

21        the chart on page 20 meet all of the claim elements for

22        the asserted claims shown on page 20?"

23             **THE COURT:**  That's it?  Did she do a report?

24        "A.  They would."

25             **MR. SCHNURER:**  And she did a report, your Honor.

1          **THE COURT:**  Mr. Sipiora, are you telling me that

2     there's no evidence on this, and their expert, your client,

3     your opponent is saying there's a whole report on this.

4          **MR. SIPIORA:**  Well, I'm reading -- unfortunately, we

5     had a rough transcript, but I'm reading from our brief on 4 and

6     5.  She was asked directly:

7          "Q.  So you can't say right now whether Apple infringes

8     with respect to those seven products or not?"

9          And she says:

10         "A.  That is correct.

11         "Q.  And with respect to Motorola, have you done analysis

12              to determine whether or not Motorola infringes with

13              respect to its incorporation of a lens made by Genius in

14              its products?"

15         There's an objection to form.

16         She answered:

17         "A.  Same as Apple.  I haven't done the analysis."

18         **THE COURT:**  Well, what about this cite that Largan

19    just read?

20         **MR. SIPIORA:**  They tried to capture it later in her

21    later testimony in rehabilitation, but she can't run and hide

22    from what she said.

23         She did an analysis of the Genius lenses.  She looked at

24    them, and she made an inference.  And then when I asked her

25    about that, I said, "You didn't do an analysis of Apple or

1    Motorola?"

2         She said, "No, I didn't."

3         "So you take the lens, and you put it into a product, and

4    it comes to the United States.  Did you analyze the product

5    when it came into the United States when it's sold by Apple

6    here?"

7         And her answer is "no."

8         **THE COURT:**  All right.  Why don't we just have a trial

9    then on Largan will prove that Apple infringes as a direct

10   infringer.  Maybe they can't, I don't know.  But, I mean, this

11   is getting too much into the fact weeds for summary judgment,

12   so I'm not going to decide whether Dr. Bentley did or did not.

13   That's not appropriate for me to do that on summary judgment.

14   So why not just have a trial where Largan proves that Apple is

15   the direct infringer and Motorola is a direct infringer; and

16   then a second question will be is there any direct infringement

17   by Genius?

18        Why isn't that the right answer here?

19        **MR. SIPIORA:**  Because it's a summary judgment motion,

20   and they have the burden to bring forth evidence.

21        **THE COURT:**  But there are fact issues here, okay.  You

22   all are fighting about facts.  Nobody is agreeing on somebody's

23   facts.

24        **MR. SIPIORA:**  Well --

25        **THE COURT:**  I thought it was clear that Apple and

1   Motorola said there's no evidence, as you said, as Apple and

2   Motorola were direct infringers.

3       Mr. Schnurer is pointing to testimony that muddies that

4   water, so why not just send it to a jury?

5           **MR. SIPIORA:**  Well, she can't --

6           **THE COURT:**  They'll put on a case that they're their

7   two biggest customers who are direct infringers.

8           **MR. SIPIORA:**  Out of fairness, she cannot, in her

9   testimony, after I have established in the deposition testimony

10  that she did not do the analysis, she cannot be asked on the

11  fly --

12          **THE COURT:**  You can read her testimony.  It happens

13  all the time.  You know.  You've been around Mississippi long

14  enough to know that experts and witnesses will say different

15  things at different times, and I'm not going to choose one side

16  on summary judgment.

17          **MR. SIPIORA:**  But you can force them to have said it

18  in the report.  That's where she had to make the disclosure.

19  She did not make the disclosure in her report.

20          **THE COURT:**  Mr. Schnurer assures me, as a

21  representation as an officer of the court, that her report

22  directs -- has conclusions in it that support the allegation

23  that Apple is a direct infringer; right?

24          **MR. SCHNURER:**  She has conclusions that each of the

25  limitations are met, and so the lawyers then can argue that

1   then is direct infringer.

2         **THE COURT:**  And for Motorola too?

3         **MR. SCHNURER:**  Yes, Your Honor.

4         **THE COURT:**  So I mean, you-all are racking up your

5   many different reports, which gives me pause on summary

6   judgment.

7         **MR. SIPIORA:**  Well, just to be very clear, I think

8   we're agreeing on this.

9         What she did in her report, she looked at the lens that we

10  provided, the file that we provided, and she said the lens file

11  provided by Genius infringes.  She did not analyze that lens

12  when incorporated into an Apple or Motorola product.

13        And when I asked her in her deposition if she had done an

14  analysis to see whether Apple or Motorola infringes, she

15  admitted that her report did not do that.  She did not do that

16  analysis.

17        They then, on rehabilitation and examination, tried to get

18  her on the fly to say, well, Genius, if you incorporate -- if

19  you would have -- if you incorporate the lens that you looked

20  at in an Apple product, would it infringe?

21        You can't have an expert make up testimony on the fly when

22  it's not in her report.

23        **THE COURT:**  Mr. Schnurer, where in your report does

24  Dr. Bentley discuss whether the Apple and Motorola products

25  meet all of the claim elements in the asserted claims?

1          **MR. SCHNURER:**  I'm looking that up right now, your

2   Honor.

3      Her report is attached as Exhibit 6 to Largan's summary

4   judgment motion of infringement.

5          **MR. SIPIORA:**  If may I, your Honor, while he's looking

6   at it, I want to give you that cite for the free sales samples.

7          **THE COURT:**  Oh, yeah.

8          **MR. SIPIORA:**  So it's actually in our brief.  Sorry I

9   couldn't find it.  It was on -- the cite is GSEO 2474 free.

10          **THE COURT:**  Do I have that?

11          **MR. SIPIORA:**  Yeah, it's an attachment, and it's

12   referenced in our brief.  I'm looking at it now.  There's a

13   price column, and the price has got zero.

14          **THE COURT:**  Okay.

15          **MR. SCHNURER:**  Oh, your Honor, starting at page --

16   I'll give you an example -- page 21 of her report, that's

17   Exhibit 6 to the summary judgment motion, paragraph 77, for

18   example, is regarding the GS-8662 version 4.  On 77, it shows

19   the GS-8662 version 4 is a five-element energy lens made and

20   sold by Genius.  It is used in the rear camera of Apple

21   products, such as the iPhone 5 and iPhone 6.  And then she goes

22   on and talks about how it meets each and every limitation of

23   the claims.

24          **THE COURT:**  That's just one of the lenses, though;

25   right?

1      **MR. SCHNURER:**  That's just one of the lenses, but she

2 marches through her report --

3      **THE COURT:**  For all of them?

4      **MR. SCHNURER:**  For all of them, your Honor, yes.  You

5 could look at the following pages.

6      **THE COURT:**  Okay.  I'll look at that.

7   I'm not a hundred percent convinced it makes a difference,

8 but I'll take a look at them.

9      **MR. SIPIORA:**  So just one last time on inducement.

10      **THE COURT:**  Yes, please.

11      **MR. SIPIORA:**  So inducement -- I went back, as you

12 recall, back to the issue of the underlying direct

13 infringement, but they're still lacking on this record any

14 evidence of any active -- activity by our client.

15   If you look at the case law, the *Global-Tech* case, there

16 has to be some active behavior on behalf of the defendants to

17 deliberately --

18      **THE COURT:**  No, listen, I understand that, and I am

19 somewhat in agreement with that.

20   So other than the SOW and the MDSA --

21      **MR. SIPIORA:**  There's nothing there.

22      **THE COURT:**  There's not anything else.  And I

23 understand you say there's nothing else.  I get that.

24      **MR. SIPIORA:**  So just to be clear, I think that, we

25 submit, is fairly compelling.

1          **THE COURT:**  Just talk to me about import, though.  I

2    mean, why should I conclude that the similar lenses are not

3    enough for import?

4          **MR. SIPIORA:**  Import, the sample question?

5          **THE COURT:**  Yeah.  I mean, for example, is there any

6    case law that says something to the effect of you look at --

7    look at the practicalities of what someone is doing, okay.  And

8    as a practical measure nobody would ever say that Genius was an

9    importer of camera lenses.

10         **MR. SIPIORA:**  Right.

11         **THE COURT:**  Now, the minimum samples delivery,

12   technically, is that a form of importation?  It could be.  You

13   know, as you reach out to other fields of inquiry, it might be

14   a form of import, ITC law, something like that.

15       But is it -- is that really -- don't you have to be

16   pragmatic about it?  And I think the answer is yes.  But what

17   case says that?

18         **MR. SIPIORA:**  Well, I would say there's two cases.

19   *Cybiotronics* was very much on fours with this.  So one district

20   court at least looked at this exact issue in terms of

21   infringement.  And they're going to try to distinguish to say

22   it was a middle person, but the Court, in its analysis, and I

23   read it again last night, was very clear:  Export or import,

24   there's a difference.

25         **THE COURT:**  But there's a layer or two in between.

1          **MR. SIPIORA:**  But they said even if -- they said even,

2    if we put that aside, even if there was direct, the Court went

3    on to say that in its --

4          **THE COURT:**  But that would be different.

5          **MR. SIPIORA:**  Well, the Court said it wouldn't be in

6    *Cybiotronics*.  They said it wouldn't be.

7          **THE COURT:**  Reasonable minds can disagree.

8          **MR. SIPIORA:**  Well --

9          **THE COURT:**  But what circuit case helps?  Any circuit.

10         **MR. SIPIORA:**  I would say the *Halo* case is on fours

11   with this, and I would say that for this reason.  Because if

12   you look at the points of contact, *Halo* was very much like this

13   case; right?  The facts were --

14         **THE COURT:**  It didn't deal with this issue.  It

15   stopped.  It did the first two, offer and sell and sale, and it

16   didn't do import.

17         **MR. SIPIORA:**  Well, it did the overall contacts to

18   look and see whether all these activities ran up to the issue

19   of whether or not there was a sale.

20         **THE COURT:**  Well, but that's sort of a black-light

21   test.  If you hold it under a black light, can you see a hidden

22   word?  I mean, *Halo* did not directly address this issue.

23         **MR. SIPIORA:**  I'm not disputing.  You're asking where

24   I would go.  I would go to --

25         **THE COURT:**  Yeah, I know.  No, I know, but those are

1    the two lifelines then.

2              MR. SIPIORA:  Yeah, well, and I would --

3              THE COURT:  They don't give me much to work with.

4              MR. SIPIORA:  Well, I mean, go to the language they've

5    cited.  Like in the briefs in terms of things they cited.

6    Import means import, imported to the United States.

7         If you want to use a common sense interpretation, which is

8    what the *Cybiotronics* court did:  Are they acting like

9    importers?  There's just no question.

10        And the Court had another kind of umbrella around it.  I

11   don't think it's necessary, but it's here, so I'll take it.

12   They said, hey, in that context, when the person on the other

13   side, the recipient, is calling for it, demanding it, setting

14   conditions on it, how can I call that importation by the guy on

15   the other side?

16        I don't necessarily think that's necessary.  I think you

17   can do it just on export/import grounds.  One person exports,

18   another person imports.

19        But in the case of *Cybiotronics*, the Court relied upon in

20   part the nature of that relationship, and the obligation of one

21   party to send something that's called for by the other.  And

22   that's exactly our case.  We cited the contract, the SOW.  It's

23   in our brief.  The SOW specifically calls out that Apple has a

24   right to call for samples, and they did.

25             THE COURT:  I understand that, I know that, but that

1    doesn't answer the question.

2        We're all on the same baseline, okay?  The issue is is

3    that act, an import act within 271, that's the issue.

4            **MR. SIPIORA:**  Right.

5            **THE COURT:**  And that's a legal issue.  It's not driven

6    by the facts so much.  The fact context is undisputed.  A

7    small, tiny, relative in the overall production of Genius, a

8    tiny fraction of lenses were sent on a developmentally test

9    basis directly from Genius to Apple, okay?

10           **MR. SIPIORA:**  For free.

11           **THE COURT:**  For free.  All right.  Even if it's not

12   for free, it doesn't matter so much.

13       Is that enough to be the basis for import liability?

14   There's no case law on that.

15       I know you love the Central District, but I'm not

16   persuaded that that's the right way to go in this case, because

17   of the factual issues.

18       But I just -- it's an intriguing issue, so I'll let you

19   close out on that one, Mr. Schnurer.

20           **MR. SCHNURER:**  Well, your Honor, there is not case law

21   from the federal circuit, but case law from the *Fellowes* case

22   talking about a single shipment of a shredder to the

23   underwriter's laboratory.  So, again, free.  But a single

24   shipment by the defendant using an air carrier like Fed-Ex to

25   UL was importation under the statute.

1          So I urge you to take a look at the *Fellowes* case, your

2    Honor.

3               THE COURT:  Okay.  All right.  Any concluding remarks?

4          MR. SCHNURER:  With respect to inducement, we focused

5    a lot on that, on the knowledge and the active inducement.  I

6    want to point out that the *Halo*'s federal circuit decision

7    found inducement on various similar facts that we have here.

8    And what's important here is that they relied on facts such as

9    having technical meetings, technical support for the defendant.

10   Like here Genius is involved in technical meetings with Apple,

11   technical support for Apple with respect to Genius's products.

12   They have meetings here in the United States in Cupertino.

13   Those sort of facts are in line with the case law that we have

14   not only in *Halo*, but in --I've lost the cite.

15              THE COURT:  You're talking about the circuit opinion

16   in *Halo*?

17         MR. SCHNURER:  The federal circuit opinion, your

18   Honor.  It affirmed the jury verdict of finding inducement,

19   indicating that there's substantial evidence for finding that a

20   verdict --

21              THE COURT:  Well, it doesn't really go on the issue.

22         MR. SCHNURER:  But at least with respect, though, to

23   the facts, and where the jury found inducement, it's similar to

24   the case here, because they looked at all the activity that

25   occurred in the United States, as well as with the party that

1   was the induced party.

2          **THE COURT:**  Was inducement appealed?

3          **MR. SCHNURER:**  The facts in the *Halo* action laid out

4   in the district court opinion?

5          **THE COURT:**  No.  So was inducement after the issue but

6   before the federal circuit.  That doesn't mean they approved

7   it.  It just means that it wasn't performed.

8          **MR. SCHNURER:**  The decision on the -- well, at least

9   in the decision on the *Halo* decision -- which, by the way,

10  there's a petition for *en banc* hearing, which they haven't

11  granted or not granted.  It's still up.  It's still waiting to

12  be determined.  But the issue on the *en banc* is on the foreign

13  activity as well as willfulness.

14      With the federal circuit decision, let me just --

15         **THE COURT:**  Where does it say that the federal

16  district considered and found inducement?  It talks about

17  willfulness and all the other issues about territoriality.  I

18  don't see anything on inducement.

19      Don't worry about it.  I'll look it up.  I don't think

20  it's in there.

21      Okay.  Mr. Sipiora?

22         **MR. SIPIORA:**  Nothing for the time -- I think in terms

23  of inducement, ultimately there is case law on this, on the

24  part as to specific activity.  And if you look at that case

25  law, I don't think it's a factual issue.  I think it's pretty

1    clear there's a spectrum.  And the court -- Supreme Court was

2    clear, willful -- and the cases since then have talked about --

3    reckless and negligence.  And to get in that high category

4    where there's liability, you have to have some overt act; you

5    have to do something to really try to avoid learning a fact.

6        And there's just simply no evidence in this record that

7    our client went out of the way to be ignorant and put its head

8    in the sand.  And that's ultimately the only way they could

9    make the point or make the argument of this deliberate lack of

10   knowledge to be able to establish what is required.

11       So in addition to not having inaction -- in addition to

12   not having done any action, there is no evidence that my client

13   willfully, intentionally put itself in a position to have to

14   deniability rights.

15       **THE COURT:**  So there's no evidence in the record that

16   Genius marketed aggressively to Apple or competed against

17   Largan to close sales or did anything that would constitute

18   actively inducing Apple to use the lenses?

19       **MR. SIPIORA:**  I don't believe there's anything in the

20   record they've submitted that I've seen.  It's a big record.

21   I've seen nothing in here that I've read that was --

22       **THE COURT:**  What does Apple say?  I thought I saw

23   something that says Apple likes to pit double suppliers against

24   each other all the time; isn't that part of their business?

25       **MR. SIPIORA:**  Apple picks who they work with, and they

1    nurture and move them forward.  They --

2           THE COURT:  But don't they have a policy that they

3    always want at least two in a supply space so they can pit each

4    other -- pit the suppliers against each other?  I saw that

5    somewhere in the papers.

6           MR. SIPIORA:  I don't think Apple would say it that

7    way.  I think Apple always wants to have at least two sources,

8    and the reasons why you can imagine.  I don't think Apple made

9    it -- to be fair --

10          THE COURT:  I don't imagine anything.  What does the

11   record say?  The record says that Apple wants to choose

12   suppliers so that it can control costs of competition; right?

13          MR. SIPIORA:  Yes, it wants to foster competition, and

14   it wants to have two parties, so they are not left with a sole

15   source situation.

16          THE COURT:  Doesn't that necessarily mean that Genius

17   is out there actively persuading Apple to use their products of

18   the lens?

19          MR. SIPIORA:  There's no evidence that they do.

20       I'm not saying that our clients don't have sales

21   activities.  They certainly do.  But there's no evidence that

22   they've put forward -- they have the burden to come forward and

23   show some explicit activity that we engaged in that was of a

24   nature of encouraging importation into the United States.

25   That's the issue we're talking about, and there is no evidence.

1    And the testimony is actually to the contrary.  Our people say

2    we don't care where it goes.  We have no stake in where it

3    goes.

4          **THE COURT:**  Does the evidence show that Genius told

5    Apple that?  Did Genius say -- is there any evidence on -- I

6    want to make sure of this, too, then we're going to have to

7    wrap up.

8          Is there any evidence that Genius and Apple had any

9    discussions about where Genius's products would end up in terms

10   of locale?

11         **MR. SIPIORA:**  I'm not of aware of anything in the

12   record.  I think the record reflects, and it pointed to the

13   fact, that we don't specifically have conversations about that,

14   and we don't elicit information from Apple on that subject.  We

15   don't pursue it.

16         **THE COURT:**  So the record would show Genius is

17   completely uninterested in where its lenses end up

18   geographically?

19         **MR. SIPIORA:**  Yes.

20         **THE COURT:**  Is that right, Mr. Schnurer?

21         **MR. SCHNURER:**  Pardon, your Honor?

22         **THE COURT:**  Is that right?  The record shows that

23   Genius has no interest whatsoever in where its lenses end up

24   geographically.

25         **MR. SCHNURER:**  Well, I disagree with that to the

1   extent that they have their head in the sand where their

2   products -- this is what the record establishes.  Genius wants

3   to sell as many lenses to Apple as possible, and they know that

4   Apple sells worldwide.

5        The record indicates that Genius does nothing to prevent

6   Apple from selling its products in the U.S. that include a

7   Genius lens.  That's willful blindness.  And so that's the

8   record we do have with respect to -- are there discussions that

9   are found in the record where Genius says, hey, Apple, do you

10  sell a product of yours that include a Genius lens?  We don't

11  have that in the record.

12       **THE COURT:**  All right.  But are there other examples

13  in the record where somebody at Genius says please never ask

14  Apple where these products end up?

15       I mean, willful blindness is just a label.  You're saying,

16  oh, they should have known, they should have asked, but what

17  does the record say?

18       **MR. SCHNURER:**  We have testimony --

19       **THE COURT:**  Hold on.  What does the record say about

20  what Genius actually did with respect to that?  Does it say?

21  Are there emails on this on the Genius side saying we never

22  want to know, make sure you never ask.

23       **MR. SCHNURER:**  There are no emails that indicate that,

24  your Honor.  There are -- there's testimony from Genius's

25  witnesses that say they never -- they never asked Apple not to

1    sell products with a Genius lens in it.  They never had

2    discussions with Apple about where Apple sells its products

3    that has Genius lenses in it.  There's information --

4          THE COURT:  What about Apple?  Does Apple know whose

5    lens is in there?

6          MR. SCHNURER:  Apple's testimony, as well as

7    declaration, indicate that they don't keep track of what

8    products they sell in the U.S. have which lenses.

9          THE COURT:  So even Apple doesn't know.

10         MR. SCHNURER:  Apple doesn't -- Apple claims --

11         THE COURT:  So nobody knows?

12         MR. SCHNURER:  Well, what it knows is the statistical,

13   which the *Whitney* case --

14         THE COURT:  No, no, no, no, I'm not asking for an

15   expert clause.

16       Neither of the key players, Genius nor Apple, knows or

17   apparently cares where the lenses end up in terms of geography;

18   right?

19         MR. SCHNURER:  Well, they have to know based on the

20   quantity of products.

21         THE COURT:  Counsel, I'm asking about the record,

22   okay?  I'm not asking you to spin on the head of a pin, all

23   right?  Just answer my question with the facts.

24       Is there any evidence in the record that Apple knows where

25   its lenses end up geographically?

1          **MR. SCHNURER:**  Where it ends up geographically, yes,

2   it would be through -- there's evidence that indicates they've

3   been the sole source for lenses, and if they're the sole source

4   for lenses, and they know Apple sells worldwide and they sell

5   into the U.S., if you're the sole source for a lens, then you

6   know --

7          **THE COURT:**  You're missing my point.

8      Does Apple care enough to track where the Genius lenses go

9   in terms of geography?

10         **MR. SCHNURER:**  No, your Honor.

11         **THE COURT:**  They don't; right?

12         **MR. SCHNURER:**  No, your honor.

13         **THE COURT:**  Okay.  Don't give me five minutes of

14   deposition.  Just be forthright.  You do yourself a favor when

15   you're honest and direct.

16         **MR. SCHNURER:**  Yes, Your Honor.

17         **THE COURT:**  You do yourself a disfavor when you do

18   these tap dances.  And I know what you're doing, and it just

19   takes up my time.  All you had to say earlier is you're right,

20   your Honor, Apple doesn't know, and they don't care.  It's a

21   fact in the record, so just own it, okay?  These constant

22   evasions are not particularly useful for your client, and

23   they're a waste of my time.

24         **MR. SCHNURER:**  Yes, Your Honor.

25         **THE COURT:**  All right.  I'm going to get this out

1    soon.

2         Where are you now?  You're all in pretrial prep?

3         **MR. SIPIORA:**  Your Honor, we have a pretrial

4    conference scheduled for June 3rd.  Trial is June 22nd.

5         **THE COURT:**  Oh, that's right.  I moved it out.

6         **MR. SCHNURER:**  Your Honor, may I?

7         **THE COURT:**  Yeah.

8         **MR. SCHNURER:**  I had one thing, because you asked for

9    another instance of direct infringement.

10        **THE COURT:**  Oh, yes, sure.

11        **MR. SCHNURER:**  There is testimony from Mr. Leopold

12   from Apple that indicates Apple directly infringes based on the

13   use of the samples.  They say requires shipment of samples to

14   Apple for every single lens, and testimony from Mr. Leopold

15   indicates they incorporate those lenses into Apple products so

16   they could do test evaluation.

17        **THE COURT:**  So you're saying Apple -- who is

18   Mr. Leopold?

19        **MR. SCHNURER:**  Mr. Leopold is the corporate witness

20   from Apple, and his testimony is at Exhibit B to Genius's reply

21   in support of its summary judgment motion.

22        **THE COURT:**  All right.  You're saying Apple --

23   Mr. Leopold confesses that Apple is a direct infringer.

24        **MR. SCHNURER:**  And it's at page 117, lines 13 to 20

25   where he indicates that -- how Apple uses those lenses.

1     So there's a separate instance of Apple -- a separate act

2     of direct infringement by Apple.

3          **THE COURT:**  All right.  I have serious concerns about

4     the reach of the territoriality issue in this case.

5          So what's actually happening right now?  Are you getting

6     pretrial materials together or what?

7          **MR. SIPIORA:**  We've made a great deal of progress

8     already in exchange, because we had an earlier date, so at this

9     point I think we're treading water in waiting for this ruling,

10    basically.

11         **THE COURT:**  How much have you gotten done so far, do

12    you know?  Lot of pretrial stuff?

13         **MR. SIPIORA:**  Well, we've exchanged a full set.

14         **THE COURT:**  Of everything?  Jury instructions?

15         **MR. SIPIORA:**  Yeah, the whole trial.

16         **THE COURT:**  Witnesses?

17         **MR. SIPIORA:**  Oh, yeah, yes, yeah, everything.

18         **THE COURT:**  All right.  Okay.  And I'm sorry.

19    Pretrial conference is June --

20         **MR. SIPIORA:**  3.

21         **THE COURT:**  All right.  Okay.  I'm going to regret

22    this, but why don't you just chill for a couple weeks and not

23    incur anymore fees.  And I should have this out soon - soon

24    meaning district court time, which is three or four weeks, all

25    right, which is very soon for this district for a case load.

1    But if I get the sense it's going to take longer, I will have

2    you reactivate your work.  But, you know, I have a strong

3    suspicion you lawyers have all spent a fortune on both sides,

4    so why don't you give yourself a little bit of a spending break

5    while I go over this.

6         Don't read too much into this, but I do think at this

7    point we should just tap the brakes a little bit.  We're not

8    slamming to a stop yet.  We may, I don't know, we may not.  But

9    let's just tap the breaks and go work on something else for a

10   while, all right?

11            **MR. SIPIORA:**  Understood.

12            **THE COURT:**  Okay.  Thank you.

13                 (Proceedings adjourned at 12:10 p.m.)

14                         ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Thursday, March 19, 2015

8

9

10

11   _____

12   Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                      Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25