1
2
3
4
UNITED STATES DISTRICT COURT

5
NORTHERN DISTRICT OF CALIFORNIA

6

7
LARGAN PRECISION CO, LTD,

Plaintiff,
Case No.  13-cv-02502-JD

8
v.

9
**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT RE INFRINGEMENT**

GENIUS ELECTRONIC OPTICAL CO., LTD.,
10

11
Defendant.

12

13
      Plaintiff Largan and defendant Genius have filed cross-motions for summary judgment on

14
the issue of direct, contributory, and induced infringement.  *See* Dkt. Nos. 214, 215.  The motions

15
overlap substantially and focus on the issue of whether Genius's conduct was sufficiently

16
connected to the United States to give rise to infringement liability.  The Court finds that, although

17
Genius's products meet the elements of Largan's patents as alleged, all but a sliver of the accused

18
conduct took place outside the territorial reach of the United States patent laws.  Consequently, the

19
Court grants both motions in part and denies them in part.

20
## FACTUAL BACKGROUND

21
      Largan and Genius supply lenses to Apple and Motorola for incorporation into cellphones

22
and tablets.  Largan alleges that Genius infringes ten claims spread out over five patents.[1]  Five

23
claims are allegedly infringed by the lenses alone; the other five allegedly infringe when the lenses

24
are combined with an image sensor.  Largan accuses eight Genius lenses, all but one of which are

25

26
[1] The patents are U.S. Patent Nos. 7,826,151 ("the '151 Patent"); 7,864,454 ("the '454 Patent");

27
8,233,224 ("the '224 Patent"); 8,310,768 ("the '768 Patent"); and 8,395,691 ("the '691 Patent"). The asserted claims are Claims 3 and 5 of the '151 Patent, Claims 11 and 18 of the '454 Patent, Claims 6 and 8 of the '224 Patent, Claims 4 and 10 of the '768 Patent, and Claims 23 and 25 of

28
the '691 Patent.

United States District Court
Northern District of California

sold to Apple.  This table summarizes Largan's infringement contentions (boldface indicates claims that require an image sensor):

| Genius Lens | Customer | Patent | Asserted Claims |
|---|---|---|---|
| GS-8662 v.4 | Apple | '151 | 3, 5 |
| | | '454 | 11, **18** |
| GS-8689 | Apple | '224 | 6, 8 |
| GS-8740 | Apple | '224 | 6, 8 |
| GS-8656 | Apple | '224 | 6, 8 |
| | | '768 | **4, 10** |
| GS-8662 v.1 | Apple | '768 | **4, 10** |
| GS-8615 | Apple | '691 | **23, 25** |
| GS-8648 | Apple | '691 | **23, 25** |
| GS-8627 | Motorola | '691 | **23, 25** |

The route Genius's lenses travel to get into the Apple products is largely undisputed.[2] Genius and Apple entered into a Master Development and Supply Agreement ("MDSA") in 2010 that governs the sale of products from Genius to "Apple or Apple Affiliates."  *See* MDSA at GSEO 00028087, Dkt. No. 222-10.  The agreement, however, does not specify the prices, quantities, or lens models to be sold by Genius.  Those details are worked out on an ongoing basis between Genius, Apple, and to some extent, other companies in Apple's supply chain.

Specifically, Genius's employees negotiate prices with Apple's Global Supply Managers (known as "GSMs") in Cupertino, California.  Leopold Decl. ¶ 9, Dkt. No. 222-24; Whitehead Dep. Tr. 104:22-105:2, Dkt. Nos. 222-6, 215-7; Mack-Mumford Dep. Tr. 48:18-50:24, 51:17-53:22, Dkt. Nos. 222-11, 216-10, 290-28.  These discussions with the GSMs can involve Genius employees traveling to the U.S., *see* Leopold Decl. ¶ 9, but are mainly done by phone, *see* Mack-Mumford Dep. Tr. 51:12-16.  The discussions result in a summary of prices, and sometimes a statement of work, or SOW, provided by Apple to Genius.  *See* Mack-Mumford Dep. Tr. 206:13-21, 19:4-9, 67:16-24.  The types of information included in a SOW has varied over time, *see*

---

[2]  Largan acknowledges in its proposed jury instructions that there is "no dispute of fact" regarding whether Genius's acts occur "in the United States" -- just the legal dispute that is the subject of this order.  *See* Joint Jury Instructions at 26:22-23, Dkt. No. 358.  Genius likewise agreed that "[t]he supply chain at issue is largely undisputed," *see* Dkt. No. 354-1 at 2:25.

Whitehead Dep. Tr. 242:1-244:25, but current SOWs include the code name of the relevant lens, a "not-to-exceed price" (or "NTE price"), and the minimum quantity of lenses to be sold, *see id.* 246:14-247:12; Sample SOW at 2, Dkt. No. 216-11.  The NTE price establishes pricing for the next several quarters; as its name implies, the price at which Genius sells its lenses can be lower than the NTE price, but cannot be higher.  *See* Whitehead Dep. Tr. 249:15-250:5.  Nevertheless, Genius claims that on at least one occasion it has charged the module integrators more than the price agreed to with Apple, when a module integrator requested a lens specification different from the one Apple had requested.  *See* Mack-Mumford Dep. Tr. 78:5-22.[3]

After the SOW legwork is done, Genius quotes the prices to the camera module integrators that constitute the next stage in Apple's supply chain.  *See id.* 206:1-9, 19:16-20:7.  The module integrators, which are located exclusively in Asia, send purchase orders to Genius (either to Genius's headquarters in Taichung, Taiwan, or to their manufacturing facilities across the Taiwan Strait in Xiamen) and the lenses are shipped to the module integrators from Xiamen.  Mack-Mumford Decl. ¶¶ 4-6, Dkt. No. 216-7.  After buying the lenses from Genius, the module integrators combine them with other components to build cameras.  *See* Mack-Mumford Dep. Tr. 20:2-16; Bone Dep. Tr. 134:11-21, Dkt. Nos. 222-5, 290-27; Joint Pretrial Statement at 6:14-15.  The module integrators sell the cameras to system integrators, all of which are located in Asia, who incorporate the cameras into phones or tablets.  *See* Mack-Mumford Dep. Tr. 91:23-92:2; Joint Pretrial Statement at 6:16-17.  The system integrators send these products to Apple for sale to end users in various countries, including the United States.  *See* Genius's Responses to RFAs 1-15, Dkt. No. 222-25.

Genius's process for selling lenses to be incorporated into Motorola products is similar.  Genius's employees negotiate pricing with Motorola "category managers".  *See* Whitehead Dep. Tr. 105:4-7.  These managers are based in Chicago, and Genius's employees on occasion travel to Chicago to meet with them.  *See id.* 107:4-7, 13-16.  The process of negotiating prices with Motorola involves three stages:  first, Genius gives Motorola a range of potentially acceptable

---

[3] Largan disputes this.  *See* Joint Pretrial Statement at 17:7-8, Dkt. No. 350.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   prices; second, Motorola asks Genius for a more granular price proposal; and third, the parties

2   negotiate an agreed-upon price.  *See id.* 163:9-165:16.  Afterwards, Genius sells its lenses to a

3   module integrator at the agreed-upon price, and the lenses progress through Motorola's supply

4   chain in a similar way to Apple's -- again all in Asia and outside the United States.  *See* Francis

5   Dep. Tr. 138:16-21, Dkt. No. 216-17.  In some cases, Genius has sold lenses to the module

6   integrator for less than the price agreed between Genius and Motorola.  *See* Whitehead Dep. Tr.

7   210:24-211:4.

8          Genius's employees state that they do not know and have never discussed where Genius

9   lenses incorporated into Apple or Motorola products ultimately end up.  *See id.* 214:11-23; 218:9-

10   16.

11          The vast majority of the accused products -- which the parties ballpark as "millions" of

12   lenses and lens/sensor combinations -- have been sold through these supply chains.  But it is

13   undisputed that Genius has provided a tiny number of the accused products directly to Apple in

14   Cupertino, California, via FedEx or DHL.  *See* Dkt. Nos. 222-34 at GSEO 00059796 (FedEx label

15   for GS-8740 shipment); 226-38 at GSEO 00024743 (GS-8656); 226-40 at GSEO 00081936 (DHL

16   label for GS-8689 shipment); 226-41 at GSEO 00084818 (GS-8588 and GS-8689).  The parties

17   agree that these were free development samples not meant for sale, that they constitute only a

18   minute fraction of the accused units, and that they were provided "at Apple's request and subject

19   to Apple's instructions."  *See* Joint Pretrial Statement at 6:7-9.[4]

20                                    **LEGAL STANDARD**

21          Summary judgment is appropriate when, drawing all justifiable inferences in the

22   nonmovant's favor, "there is no genuine dispute as to any material fact and the movant is entitled

23   to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

24   242, 255 (1986).

25          A person who, without a license, "makes, uses, offers to sell, or sells any patented

26

27   _____

28   [4] Largan's counsel attempted to argue at the motion hearing that the samples were not, in fact, free, but this is inconsistent with the list of undisputed facts it agreed to in the Joint Pretrial Statement.

United States District Court
Northern District of California

invention within the United States or imports into the United States" is liable for direct patent infringement.  35 U.S.C. § 271(a).  The final clause of that provision makes clear that direct infringement liability is "limited to infringing activities that occur within the United States." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005).  In other words, the "general rule under United States patent law is that no infringement occurs when a patented product is made and sold in another country."  *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 441 (2007).  Indeed, there is a "strong policy against extraterritorial liability" in the patent law.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1378 (Fed. Cir. 2014). A patentee's remedy against such foreign activity lies, if anywhere, in foreign law.  *See Microsoft*, 550 U.S. at 456.

## DISCUSSION

## I.   DIRECT INFRINGEMENT

Apart from an indefiniteness challenge that the Court previously rejected, Genius does not dispute that each of the claim elements in issue are met by its lenses alone (for those claims that do not require an image sensor) or by the downstream Apple and Motorola products (for those claims that do require an image sensor).[5]  *See* Genius's Response to Largan's Motion for Summary Judgment of Infringement at 6:18-19, Dkt. No. 280; Claim Construction Order at 15:10-12; 19:3-5, Dkt. No. 142.  But Genius contends that, even though it practices Largan's inventions, its conduct is beyond the geographic coverage of the United States patent laws and consequently cannot amount to infringement under section 271(a).  After carefully reviewing the evidence on summary judgment, most of which is not meaningfully disputed, the Court finds that the undisputed facts establish that the majority of Genius's accused lenses are not sold or offered for sale in the United States, and that it cannot be liable for direct infringement with respect to those

---

[5] Genius argues in passing that it is entitled to summary judgment of no indirect infringement because Largan's expert, Dr. Julie Bentley, stated in deposition that she has not done any analysis of whether Apple or Motorola directly infringe any of the asserted patents.  But Bentley in fact opined that the Apple and Motorola products incorporating the accused lenses meet every claim limitation; she just does not have an opinion on the ultimate question of whether that should be considered "direct infringement."  *See* Bentley Dep. Tr. 219:8-220:4, Dkt. No. 289-9.  Genius's motion for summary judgment on this ground is denied.

United States District Court
Northern District of California

1    lenses.  Genius is liable, however, for lenses it ships directly into the United States to Apple or

2    Motorola.

3       **A.  Genius Does Not Directly Infringe the Asserted Claims by Selling into Apple's and
            Motorola's Supply Chains**

4           Largan argues that Genius is liable under section 271(a) because it sells, offers for sale,

5    and imports the accused products in or into the United States.  *See* Largan's Motion for Summary

6    Judgment at 8:8-9, Dkt. No. 222.  Whether "activities in the United States, as construed by a

7    reasonable jury, are sufficient to establish an 'offer to sale' or 'sale' within the meaning of 35

8    U.S.C. § 271(a)" can be resolved on summary judgment.  *MEMC*, 420 F.3d at 1375-77 (affirming

9    summary judgment of no direct infringement for product sales in Japan).

10          There is no doubt that Genius sells the vast majority of the accused products abroad to

11   other foreign companies.  The question is whether its relationship with U.S.-based downstream

12   customers like Apple and Motorola, in combination with its sales into a supply chain that

13   terminates in (among other places) the U.S., is sufficient to deem these sales "within the United

14   States."  The Court concludes that they are not.

15          The Federal Circuit has recently addressed a strikingly similar supply chain in *Halo Elecs.,*

16   *Inc. v. Pulse Elecs., Inc*.  There, the defendant, Pulse, supplied components that were ultimately

17   incorporated into Cisco products.  *See Halo*, 769 F.3d at 1375.  These components were supplied

18   pursuant to a general agreement with Cisco, which "set forth manufacturing capacity, low price

19   warranty, and lead time terms," but did not name any specific Pulse product or list any prices.  *Id.*

20   Instead, Cisco would send a request for a quote to its component suppliers (including Pulse), and

21   Pulse would respond with a proposed price and minimum quantity for each product.  *Id.*  After

22   further negotiation, Cisco would issue an agreed-upon price and a percentage allocation of

23   products to be purchased from Pulse.  *Id.*  Pulse would then sell its products to contract

24   manufacturers in Asia, who would be expected to use Cisco's price and allocation.  *Id.*  The

25   contract manufacturers would use Pulse's components to assemble Cisco's end products and sell

26   them to Cisco.  *See id.* at 1375-76.

27          On these facts, the Federal Circuit held that Pulse was not liable for direct infringement

28

6

United States District Court
Northern District of California

1    because "pricing and contracting negotiations in the United States alone do not constitute or

2    transform … extraterritorial activities into a sale within the United States for purposes of §

3    271(a)." *See id.* at 1379.  While acknowledging a significant amount of U.S.-based activity on

4    Pulse's part, including "meeting regularly with Cisco design engineers, sending product samples

5    to Cisco for pre-approval, attending sales meetings with its customers, and providing post-sale

6    support for its products," *id.* at 1375, the Federal Circuit held that three facts precluded direct

7    infringement liability:  (1) the products "were manufactured, shipped, and delivered to buyers

8    abroad"; (2) "Pulse received the actual purchase orders for those products abroad"; and (3) "Pulse

9    was paid abroad by [the] contract manufacturers, not by Cisco."  *Id.* at 1379.  The court

10   recognized that the purchase orders were made under the contract between Pulse and Cisco and

11   stemmed from their pricing negotiations for specific products, but found that neither the contract

12   nor the negotiations constituted "a firm agreement to buy and sell, binding on both Cisco and

13   Pulse," and therefore could not form the basis for finding a U.S. sale.  *See id.*  Since the "final

14   formation of a contract for sale encompassing all essential terms as well as the delivery and

15   performance under that sales contract" occurred outside the United States, the sales were not

16   "within the United States."  *See id.*

17        The facts in *Halo* are a close match to those here.  As in *Halo*, Genius's lenses are

18   manufactured abroad in response to purchase orders from overseas module integrators, who pay

19   Genius abroad.  And as in *Halo*, even though Genius had high-level contract and pricing

20   negotiations with Apple and Motorola domestically, "the vast majority of activities underlying the

21   sales transaction occurred wholly outside the United States."  *Halo*, 769 F.3d at 1378.

22        Largan seeks to sidestep *Halo* by distinguishing Apple and Motorola's supply chains from

23   Cisco's on two particulars:  the fact that Genius has an MDSA that governs its sales to Apple, and

24   the fact that Genius has SOWs with respect to specific individual products that provide NTE

25   prices and minimum lens quantities that Genius is obligated to sell.

26        Neither of these observations provides a meaningful basis to distinguish Cisco's supply

27   chain from Apple's and Motorola's -- or evade *Halo*.  Certainly Genius and Apple's commercial

28   relationship is governed by their MDSA, but Pulse and Cisco had a general business agreement as

well.  *See id.* at 1379.  The reason the Federal Circuit found that agreement insufficient was that it did not "include[e] the final formation of a contract for sale encompassing all essential terms" -- a reason that applies with equal force to the MDSA.  *See id.*  As another judge in this district, faced with similar facts, recently held, "at most, the evidence shows that [defendants] the TSMC entities engaged in conduct amounting to domestic contracts for foreign sales -- that is, contracts executed in the United States but contemplating strictly foreign manufacture and delivery.  Such conduct does not constitute direct infringement because the accused wafers are manufactured and sold outside the United States."  *Ziptronix, Inc. v. Omnivision Techs.*, C 10-05525 SBA, 2014 WL 5463051, at *5 (N.D. Cal. Oct. 21, 2014).

Nor does the fact that the SOWs issued by Apple provide NTE prices and minimum lens quantities for specific products compel a different result, even putting aside Genius's claims that it has sold lenses for more than the NTE price and that not every negotiation results in an SOW.  At most, the SOWs correspond to the "quarterly pricing negotiations for specific products" between Pulse and Cisco that the Federal Circuit found insufficient in *Halo* to deem the foreign sales of those products to be "within the United States."  769 F.3d at 1379.  In fact, the pricing negotiations in *Halo* seem to have been even more restrictive than those at issue here:  there, Cisco and Pulse had a general agreement that set forth a "low price warranty," and after the pricing negotiations, Cisco would issue an "agreed-upon price" -- not just an NTE price -- that Cisco's contract manufacturers were expected to apply.  *See id.* at 1375.  Accordingly, the SOWs do not constitute "the final formation of a contract for sale encompassing all essential terms."  *Id.* at 1379.

The Court is also unmoved by Largan's citation to *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-5341 YGR, 2014 WL 580836, at *4 (N.D. Cal. Feb. 13, 2014).  That case, which found that a contract between a U.S. defendant and a U.S. downstream customer was sufficient to render the defendant's foreign sales actionable under section 271(a), distinguished the *district court* opinion in *Halo* by saying that it involved a case where there were "merely 'some pricing discussions'" in the United States and that "there was no evidence of a direct contractual relationship between Cisco and Pulse."  *See id*. (citation omitted).  *MediaTek*

8

1   was decided prior to and without the benefit of the Federal Circuit opinion in *Halo*, which makes

2   clear that Cisco and Pulse did have a direct contractual relationship, and that Pulse's relationship

3   with Cisco and the U.S. went considerably beyond "some pricing discussions." *See Halo*, 769

4   F.3d at 1379.  In any event, even assuming purely for discussion that *MediaTek* is consistent with

5   the Federal Circuit's subsequent *Halo* decision, it is distinguishable based on the fact that both

6   parties to the contract in that case were U.S. companies, whereas in this case Genius is Taiwanese.

7   *MediaTek* does not compel revisiting the Court's conclusion that under *Halo* and *Ziptronix* (the

8   former of which is, unlike *MediaTek*, binding precedent on this Court), Genius's sales to Apple's

9   and Motorola's supply chains are not infringing under section 271(a).

10      Not only are Genius's sales into the Apple and Motorola supply chains not sales "within

11   the United States" under section 271(a), they are not offers to sell within the United States, either.

12   *Halo* offers definitive guidance on this question as well.  "An offer to sell, in order to be an

13   infringement, must be an offer contemplating sale in the United States.…  If a sale outside the

14   United States is not an infringement of a U.S. patent, an offer to sell, even if made in the United

15   States, when the sale would occur outside the United States, similarly would not be an

16   infringement of a U.S. patent." *Halo*, 769 F.3d at 1381.  Largan claimed at oral argument that

17   because the Apple-Genius MDSA governs sales to "Apple and Apple Affiliates," and Apple is a

18   U.S. company, the agreement contemplates sales in the U.S.  But nothing in the agreement

19   specifies where sales are to take place, and as just discussed, they in fact do take place outside the

20   U.S.  Because Genius's foreign sales into the Apple and Motorola supply chains are not sales in

21   the United States, any associated offer to sell would not be infringing.

22      Largan also makes the casuistic argument that even if Genius's sales into Apple's and

23   Motorola's supply chain do not actually take place within the U.S., they should be so deemed by a

24   generic California choice of law provision in the Genius-Apple MSDA.  That provision reads:

25          This Agreement and the rights and obligations of the parties will be
            governed by and construed and enforced in accordance with the
26          laws of the State of California as applied to agreements entered into
            and to be performed entirely within California between California
27          residents, without regard to conflicts of law principles.

28   MSDA ¶ 16.11, Dkt. No. 222-10.  Largan argues that under this provision, all of Genius's

United States District Court
Northern District of California

activities under the MSDA, including its manufacture and sale of the accused lenses, should be treated as if they took place in California for purposes of satisfying section 271(a).

To dispatch this argument, the Court need not even reach Largan's highly dubious claim that the location of infringement for purposes of the patent laws can be fixed by contract rather than the actual facts, because the contractual language Largan cites does not say what Largan claims it says.  The quoted text provides only that the agreement should be construed and enforced according to California law to the same extent that that contracts performed within California between California residents are.  It does not mean that all activities performed under the contract are to be treated as if performed entirely in California, as Largan suggests, much less that they should be so treated under both California and federal patent law even though the choice of law provision mentions only California law.

*Gabana Gulf Distribution, Ltd. v. Gap Int'l Sales, Inc.*, No. C 06-02584 CRB, 2006 WL 2355092, at *4-5 (N.D. Cal. Aug. 14, 2006), which Largan cites extensively for its interpretation of a similar contractual provision, holds nothing to the contrary.  There, the court held that the California Franchise Relations Act, which is applicable to "any franchise where either the franchisee is domiciled in this state or the franchised business is or has been operated in this state," applied to a contract with a similar choice of law provision despite the fact that one of the parties was not domiciled in California.  *See id.*  That is entirely consistent with the text of the choice of law provision.  What is not consistent with the text is to use it to convert activities abroad to domestic activities -- and that too for purposes of federal (not California) law.  *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998) ("Defining the contours of the tort of infringement, which exists solely by virtue of federal statute, entails the construction of the federal statute and not a state's common or statutory law."); *Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co.*, 479 F. Supp. 2d 388, 406 (S.D.N.Y. 2007) ("The Supply Agreement's governing law provision serves only the commonplace contractual purposes of creating jurisdiction in Florida for purposes of adjudicating any disagreements that might arise between the contracting parties and selecting the applicable governing law.  It cannot be read to render wholly extraterritorial conduct territorial and, thereby, create 'offer to sell' liability under § 271(a).").

United States District Court
Northern District of California

10

Consequently, the Court denies Largan's motion for partial summary judgment of direct infringement with respect to Genius lenses sold abroad into Apple and Motorola's supply chains, and grants Genius's motion for partial summary judgment of no direct infringement with respect to those sales.

**B. Genius Directly Infringes the Asserted Claims by Importing Accused Products into the United States**

The parties agree that Genius sends a very small number of product samples directly into the United States. Genius argues that it is not importing these samples into the United States under section 271(a); rather, it is exporting them from abroad, and their recipient -- namely Apple -- is the importer.

Genius's argument is based entirely on an order in *Cybiotronics, Ltd. v. Golden Source Elecs. Ltd.*, 130 F. Supp. 2d 1152 (C.D. Cal. 2001). That case involved a Hong Kong corporation named Smoothline that designed and manufactured patented caller ID telephones for purchase by an American company called NAFT. *Cybiotronics*, 130 F. Supp. 2d at 1157-58. The phones were manufactured in mainland China and shipped to Hong Kong where NAFT would take title; according to Smoothline, NAFT would then sell the phones to another American company, BellSouth, while the phones were still in Hong Kong. *See id.* at 1158-59. The plaintiff contended that Smoothline would also sometimes send its products directly to the U.S., for example by sending working samples of its accused products to NAFT in New York, shipping accused products to testing labs in the United States via DHL, arranging to ship the products to the port of Los Angeles, or taking products out of containers on ocean liners and sending them to NAFT by air transit. *See id.* at 1173.

As the court in *Cybiotronics* noted, it was only in 1996 that 35 U.S.C. § 271(a) was amended to add importing into the United States as a basis for liability; it has therefore "received little judicial interpretation" and is "also not blessed with a descriptive legislative history, or with further elaboration in the statute." *Cybiotronics*, 130 F. Supp. 2d at 1174-75.

*Cybiotronics* ultimately ended up finding that Smoothline was not liable as an importer. The court drew a sharp distinction between "exporters" and "importers," finding that the fact that

United States District Court
Northern District of California

1   Smoothline was listed as an "exporter" on the bills of lading for the products shipped into the U.S.

2   did not necessarily mean that it was also the importer.  *See id.* at 1175-76; *see also Fellowes, Inc.*

3   *v. Michilin Prosperity Co., Ltd.*, 491 F. Supp. 2d 571, 584 (E.D. Va. 2007) (holding that where

4   accused products were sold abroad by manufacturer "FOB China," the manufacturer was an

5   exporter and the buyers were importers).  The opinion was inconclusive, however, about the

6   identity of the importer:  at one point, it suggests that NAFT was the importer because the goods

7   were NAFT's property at the time they were shipped to the U.S., but at another point it suggests

8   that the importer was "either NAFT or BellSouth."  *Cybiotronics*, 130 F. Supp. 2d at 1176.

9          The basis on which the *Cybiotronics* court found that Smoothline was not an importer also

10  varied depending on whether the allegedly imported products were shipped for sale or sent as

11  samples for testing.  With respect to the products sent via air transit, the court found that

12  Smoothline was not directly engaged in shipping the goods to the United States, but rather

13  coordinated those shipments through a third party, and therefore was not an importer.  *See id.* at

14  1176.  On the other hand, with respect to the samples sent into the U.S. for approval and testing,

15  the court held that there was no basis for importation liability because the samples were "not for

16  purposes of any direct commercial benefit, nor were they items that were being transmitted for

17  purposes of sale."  *Id.* at 1176.

18         The Court finds *Cybiotronics* to be largely inapplicable to this case and otherwise

19  unpersuasive.  The portion that concludes that Smoothline was not an "importer" because it

20  coordinated shipments using a third party is not apposite here, given the fact that Genius ships its

21  samples directly into the U.S.  To the extent *Cybiotronics* has anything to say about the situation

22  in this case, it would support finding that Genius did import the samples it sent directly into the

23  U.S.  *Cybiotronics* left undecided whether the actual importer was NAFT or BellSouth.  *See id.* at

24  1175-76.  With respect to the samples Genius sent directly to the U.S., Genius occupies a position

25  more similar to NAFT's than to Smoothline's:  there is no third party to whom Genius transferred

26  the samples to abroad before they were sent to Apple or Motorola in the U.S.  Moreover, there is

27  no indication that title to the samples is transferred to the recipient abroad -- a fact both

28  *Cybiotronics* and *Fellowes* relied on to find a lack of importation liability.  *See id.* at 1176 (finding

1    that NAFT was the importer because when the products were shipped to the U.S., "the products

2    were at that time the 'property' of NAFT"); *Fellowes*, 491 F. Supp. 2d at 583-84 (finding that

3    samples shipped to the U.S. to obtain safety approval were imports, but that sales where title

4    passed to recipient abroad were not imports).

5           And the *Cybiotronics* court's conclusion that importation occurs only when a product is

6    brought into the United States for commercial benefit is not well taken.  It is true that certain

7    district courts have required that to be actionable under section 271(a), the patented product must

8    be imported with the intention of selling it or offering it for sale.  *See Medtronic Vascular, Inc. v.*

9    *Boston Scientific Corp.*, 348 F. Supp. 2d 316, 322-23 (D. Del. 2004); *Black & Decker, Inc. v.*

10   *Shanghai Xing Te Hao Industrial Co.*, 2003 WL 21383325, *3 (N.D. Ill. 2003) ("[S]imply

11   bringing a product in the United States for display at a trade show does not constitute importation

12   under § 271(a) absent evidence that the corporation brought the particular product into the United

13   States with the intent to sell it."); *Creo Products, Inc. v. Presstek, Inc.*, 166 F. Supp. 2d 944, 976

14   (D. Del. 2001), *aff'd*, 305 F.3d 1337 (Fed. Cir. 2002); *Donnelly Corp. v. Reitter & Schefenacker*

15   *GmbH & Co. KG*, 189 F. Supp. 2d 696, 703 n.9 (W.D. Mich. 2002).  But the plain text of section

16   271(a) does not contemplate such limitations.  *See Athena Feminine Techs. Inc. v. Wilkes*, C 10-

17   04868 SBA, 2011 WL 4079927, at *4 (N.D. Cal. 2011) ("Under the plain terms of § 271(a), the

18   act of importation, standing alone, is sufficient to state a claim for direct infringement.");

19   *Fellowes*, 491 F. Supp. 2d at 583-84 (citing dictionaries and holding that "[t]o directly infringe

20   under § 271(a), an importation of an infringing product need not include, nor be followed by, a

21   sale, offer to sell, or any other particular course of action; the infringing activity is the

22   unauthorized importation of an infringing product itself."); *Bristol-Myers Co. v. Erbamont Inc.*,

23   723 F. Supp. 1038, 1042-44 (D. Del. 1989) (analyzing plain meaning and legislative history of

24   similar importation provision in 35 U.S.C. § 271(g)).  Rather, importation simply means "[t]he

25   bringing of goods into a country from another country."  Black's Law Dictionary 824 (9th ed.

26   2009); *see also Canton R.R. Co. v. Rogan*, 340 U.S. 511, 515, (1951) ("to import means to bring

27   into the country"); *Cunard Steamship Co. v. Mellon*, 262 U.S. 100, 122 (1923) ("Importation …

28   consists in bringing an article into a country from the outside.").

Developments after the *Cybiotronics* opinion also cast doubt on its sharp division between exporters and importers.  In *Nuance Comm'ns v. Abbyy Software House*, 626 F.3d 1222, 1233 (Fed. Cir. 2010), a personal jurisdiction case, the Federal Circuit held that Russia-based defendant Abbyy Production could import products into California within the meaning of section 271(a) despite having no physical presence there.  *See id.* ("Abbyy Production has purposefully imported the accused products into California …").  The court relied on the fact that Abbyy Production sent the products to a California entity and retained ownership of the products after they entered California.  *See id.*  This resembles what Genius does here -- Genius is the sender of the accused lenses into the United States, and that fact that it is not the recipient does not automatically preclude importation liability.

Genius refers to the lenses directly sent into the United States as "de minimis," but to the extent its use of this phrase seeks to invoke the de minimis exception to patent infringement, that defense fails.  The "de minimis exception" to infringement is "very narrowly" construed, providing a "defense to infringement performed for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry."  *See Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343, 1349 (Fed. Cir. 2000) (internal quotation and citation omitted).  There is no evidence that the lenses Genius sent into the United States fit into these categories.  Accordingly, the Court grants Largan's motion for summary judgment that the lenses Genius sent directly to the United States directly infringe the asserted patents, and denies Genius's motion for summary judgment to the same extent.

## II. INDIRECT INFRINGEMENT

### A. Contributory Infringement

Section 271(c) defines "contributory infringement" as acts that include the sale or importation into the United States of a non-staple article of commerce that is a "component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process," where the non-staple article constitutes a "material part of the invention" and is known to be made or adapted for the purpose of infringing, within the United States, a patented product or process.  Contributory infringement refers to the "core notion that

United States District Court
Northern District of California

one who sells a component especially designed for use in a patented invention may be liable as a contributory infringer, provided that the component is not a staple article of commerce suitable for substantial noninfringing use." *Ricoh Co., Ltd. v. Quanta Computer Inc.,* 550 F.3d 1325, 1337 (Fed. Cir. 2008). "In order to succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, plaintiff must show that defendant knew that the combination for which its components were especially made was both patented and infringing and that defendant's components have no substantial non-infringing uses." *Lucent Techs. v. Gateway, Inc.,* 580 F.3d 1301, 1320 (Fed. Cir. 2009) (internal citations and quotation marks omitted).

Largan alleges contributory infringement only for the claims that require an image sensor because the Genius lenses alone constitute the entire accused product for the non-image sensor claims. Because contributory infringement has the same territorial requirements as direct infringement, the Court's analysis with respect to direct infringement applies. In other words, Genius's sales into Apple's and Motorola's supply chains cannot give rise to contributory infringement, but its shipments of samples directly into the United States can.

With respect to the samples sent into the United States, Genius does not dispute that the lenses form a material part of the lens-sensor combination, that it knows its lenses are made or adapted for use in that configuration, and that the lenses are not staple articles of commerce suitable for substantial noninfringing uses. Indeed, Genius's technical expert offered no opinion that the lenses have substantial noninfringing uses. *See* Barbastathis Dep. Tr. 150:7-151:11, Dkt. No. 222-33. Summary judgment of contributory infringement is therefore appropriate for the sample lenses sent directly into the United States, while summary judgment of no contributory infringement is warranted for the lenses Genius sells abroad into Apple's and Motorola's supply chains.

## B. Induced Infringement

Largan also seeks summary judgment against Genius for induced infringement. "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "To prevail on inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to

encourage another's infringement." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1353-54 (Fed. Cir. 2008) (internal quotation marks omitted); *see also DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc). The knowledge requirement may be satisfied by showing actual knowledge or willful blindness. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Moreover, the knowledge requirement applies both to "knowledge of the existence of the patent" and "knowledge that the induced acts constitute patent infringement." *See Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367 (Fed. Cir. 2014).

Induced infringement also requires a showing of intent. "[M]ere knowledge of possible infringement by others does not amount to inducement; [rather,] specific intent and action to induce infringement must be proven." *DSU*, 471 F.3d at 1305 (citation omitted). "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Id.* at 1306 (citation omitted).

Genius disputes meeting the knowledge requirement. It concedes that it knew about the patents-in-suit since at least April 2, 2013, and it does not dispute that Motorola and Apple end products incorporating Genius lenses meet every element of the asserted claims under the Court's constructions. But it points out -- and there appears to be no dispute between the parties on this issue -- that Genius does not have insight into Apple and Motorola's supply chain after it sells its lenses to the module integrators, and has no idea whether its lenses go into products sold in the United States. For all Genius knows, Apple and Motorola's supply chain could be structured in such a way that all of the Apple and Motorola end products that are sold in the United States incorporate only lenses sold by Largan or other suppliers, rather than Genius.[6] Thus, even if

---

[6] As an aside, the Court notes that this is the problem with the numerical example in Largan's Motion in Limine No. 1, which purports to show, presumably using the binomial distribution, that the probability that all of Apple and Motorola's U.S.-sold products use Largan lenses is extremely small. *See* Dkt. No. 354 at 4:20-5:10 & n.5. The calculation depends on the assumption that the U.S.-sold lenses are randomly drawn from the Apple and Motorola supply chains, or in other words, that the Apple and Motorola supply chains have no systematic bias in terms of whether a product with a Genius-sourced lens ends up in or out of the U.S. That assumption may be true (though Largan points to no evidence to back it up apart from the fact that Apple does not track where each lens supplier's products end up) but there is no indication that Genius knows it to be true. Genius faces not some quantifiable risk that the lenses it sells into the Apple and Motorola supply chains end up in U.S.-sold products, but what the economist Frank Knight called unquantifiable "uncertainty." *See* Frank Knight, *Risk, Uncertainty and Profit* 19-20 (1921). In

United States District Court
Northern District of California

1  Genius induced Apple and Motorola to use its lenses, it lacked the requisite "knowledge that the

2  induced acts constitute patent infringement," because the patented Apple and Motorola end

3  products using its lenses could all be sold outside the United States, where they would not infringe

4  Largan's United States patents.  *See Nichia Corp. v. Seoul Semiconductor Co.*, C-06-0162 MMC,

5  2007 WL 2428040, at *4 (N.D. Cal. Aug. 22, 2007) (holding that summary judgment of no

6  induced infringement was warranted because of lack of evidence that defendant assisted or

7  otherwise encouraged its customer to sell accused product to subsidiary which in turn sold product

8  into the U.S.).  Cases denying summary judgment of no induced infringement for foreign sales

9  have pointed to evidence, either direct or circumstantial, that showed that the accused infringer

10  likely knew and intended for its products to be used in the United States.  *See Semiconductor*

11  *Energy Lab. Co. v. Chi Mei Optoelectronics Corp.*, 531 F. Supp. 2d 1084, 1113 (N.D. Cal. 2007)

12  (citing testimony from defendant's customers and the fact that defendant had "designated return

13  and repair centers in the United States" as evidence that it knew its products would be sold in the

14  U.S.); *Halo Elecs., Inc. v. Pulse Eng'g, Inc.*, 810 F. Supp. 2d 1173, 1208-09 (D. Nev. 2011), *aff'd*

15  769 F.3d 1371 (Fed. Cir. 2014) (citing testimony from defendant's corporate representative that

16  "he believed at least some of the accused products end up in the United States" and evidence that

17  defendant provided customer service support to U.S. entities to deny summary judgment of no

18  inducement).  No such evidence was offered here.

19        Largan's response is twofold.  It argues that, at least for certain time periods, Genius knew

20  it was the only supplier of certain lens designs used in some Apple and Motorola products (sold by

21  Genius under the names GS-8627 and GS-8615), and would therefore know that products using

22  those lens designs that were sold in the U.S. used Genius lenses.  With respect to the other

23  products, Largan argues that even if Genius did not know that its products were incorporated into

24  U.S.-sold products, it was willfully blind to the commercial reality that its products would end up

25  in the United States.

26  _____

27  any event, it is doubtful whether, even if Genius "subjectively believe[s] that there is a high
   probability" that its lenses end up in U.S.-sold products, that that suffices to establish knowledge,

28  since as explained below, a subjective belief that a fact is highly likely is merely the first element
   necessary to establish willful blindness -- a lower level of scienter than knowledge.

United States District Court
Northern District of California

1    To bolster the first argument, Largan offers two documents and a deposition transcript.

2    The first document is an internal Genius email thread discussing the "K93" lens, which appears to

3    be the GS-8615 lens incorporated into a certain Apple product.  *See* Dkt. No. 222-32 at GSEO

4    00088199.  One of the emails refers to K93 as "sole sourced," indicating that Genius is the only

5    supplier.  *See id.*  On the other hand, a subsequent email asks to "find out Largan [*sic*] current

6    price," suggesting that Largan was another source for that lens design.  *See id.*  The second

7    document, which refers to the GS-8627 sold to Motorola, is a fairly cryptic table; the Court is not

8    sure how it demonstrates that Genius is the sole supplier for the lens, and Largan offers scant

9    guidance.  *See* Dkt. No. 222-46.  The transcript from the deposition of Genius employee Jeffrey

10   Ross that Largan points to simply says that he knows that in "an earlier program that we did that

11   we were the single source supplier," but does not mention the Motorola product for which Genius

12   was the sole supplier and whether that product incorporated an accused lens or was sold in the

13   U.S.  Ross Dep. Tr. 58:10-23, Dkt. No. 222-49.  Largan also argues that its own data shows no

14   sales of lenses for the Apple product in question after the second quarter of 2013, *see* Largan

15   Reply at 11 n.17, Dkt. No. 313, which it says demonstrates that Genius must have been the sole

16   source of lenses for that product -- but even if that is true, it is unclear how Genius could have

17   known this.  Taken together, this conflicting and uncertain evidence demonstrates at most a

18   genuine fact dispute about whether Genius ever knew it was the sole supplier for certain products

19   at certain time periods -- a dispute that the Court cannot resolve either way on summary judgment.

20   Largan's second argument, which alleges that Genius was willfully blind, does not succeed

21   in establishing that Genius had that exacting level of scienter.  The Supreme Court has held that,

22   for purposes of induced infringement liability, willful blindness has two requirements:  "(1) the

23   defendant must subjectively believe that there is a high probability that a fact exists and (2) the

24   defendant must take deliberate actions to avoid learning of that fact."  *Global-Tech*, 131 S. Ct. at

25   2070.  This is a standard imported from criminal law that, as the high court noted, goes beyond

26   mere recklessness and negligence.  *See id.* at 2070-71.  Rather, "a willfully blind defendant is one

27   who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can

28   almost be said to have actually known the critical facts."  *Id.*  Deliberate indifference to a "known

risk" of infringement is insufficient to permit a finding of knowledge or willful blindness for purposes of induced infringement liability, absent "active efforts by an inducer to avoid knowing about the infringing nature of the activities." *Id.*

There is no evidence of willful blindness here. Largan points to the fact that Genius has "not talked about" whether Apple and Motorola products incorporating the accused lenses are sold in the U.S with Apple or Motorola, *see* Mack-Mumford Dep. Tr. 245:8-16, and that Genius "never asked" Motorola or Apple not to ship products incorporating Genius lenses into the U.S., *see* Whitehead Dep. Tr. 215:11-22, 219:17-21. But this proves, at most, "deliberate indifference to a known risk" of infringement -- precisely the standard that the Supreme Court rejected in *Global-Tech. See* 131 S. Ct. at 2068. Willful blindness requires not just a failure to ask whether any sales infringed, but an affirmative act to remain ignorant of infringing sales. In any event, even if Genius had asked Apple and Motorola, there is no indication that they knew or would have told Genius how many of its lenses end up in the end products they sell in the U.S.: in fact, Apple has stated that it itself does not track which lenses are used in its U.S.-sold products in the ordinary course of business, though it apparently managed to come up with approximate numbers in response to Largan's and Genius's subpoenas. Leopold Decl. ¶ 7 ("In its ordinary course of business, Apple does not track the supplier of the lenses of its products that are sold in the U.S."); Supplemental Leopold Decl. ¶ 8 & Ex. 1, Dkt. No. 222-3; Joint Pretrial Statement at 6:18-19. Perhaps Genius could have learned that its lenses made it into the U.S. by affirmatively purchasing Apple or Motorola products in the U.S. and tearing them down to see which lenses were used in them. But again, willful blindness consists of taking deliberate actions to avoid finding out whether one's products infringe, not a failure to take deliberate actions to find out whether they do.

Genius's lack of knowledge or willful blindness, which is apparent from the undisputed facts, disposes of Largan's induced infringement claims with all the lenses except for certain sales of the GS-8627 and GS-8615 lenses. For those two products, the Court must still decide whether Genius can win on summary judgment by showing a lack of specific intent and some affirmative act to induce infringement. Seeing as "[i]ntent is a factual determination particularly within the

United States District Court
Northern District of California

19

province of the trier of fact," *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005), the Court is unable to say at this stage that a jury could not infer intent and affirmative acts to induce infringement on Genius's part based on their attempts to design lenses to meet Apple's specifications, assuming Largan is able to show at trial that Genius knows those lenses end up in the U.S.  *See* Bone Dep. Tr. 259:6-10.

Consequently, the Court denies the parties' cross-motions for summary judgment regarding induced infringement with respect to the GS-8615 and GS-8627 lenses during the time periods when Largan alleges Genius knew it was the sole supplier of those designs, because whether Genius ever knew that those lenses were the sole lenses supplied for a U.S.-sold product is a disputed issue of material fact.  The Court grants Genius's motion for summary judgment of no induced infringement with respect to the other lenses sold into Apple's and Motorola's supply chains and denies Largan's motion for summary judgment of induced infringement with respect to the same, because Largan has not adduced any facts showing that Genius knew that its products were incorporated into Apple or Motorola end products sold in the U.S., or was willfully blind concerning their incorporation into U.S.-sold products.

## III. MISCELLANEOUS

Genius moves for summary judgment of no infringement as to the GS-8662 v.1 lens because Genius stopped selling it before the '768 patent issued.  As Largan does not dispute this, the Court grants summary judgment of noninfringement with respect to that lens.

### CONCLUSION

The Court **grants** summary judgment of: (1) no direct or contributory infringement for the accused Genius products sold into the Apple or Motorola supply chains; (2) direct and contributory infringement for the accused Genius products sent directly into the U.S.; and (3) no induced infringement for products sold into the Apple and Motorola supply chains, except for the GS-8627 and GS-8615 lenses that were sold during time periods when Largan alleges Genius knew it was the sole supplier for those lenses.  The Court **denies** summary judgment of no induced infringement for those GS-8627 and GS-8615 lenses that were sold at times when Largan alleges Genius knew it was the sole supplier, and otherwise **denies** the cross-motions for summary

United States District Court
Northern District of California

judgment on infringement.  Only the GS-8627 and GS-8615 holding is based on a disputed issue of fact that must go forward for trial.  In all other cases, the Court's holdings are based on facts for which there is no genuine dispute and the moving party is entitled to judgment as a matter of law.

The remaining issues here appear to boil down to the amount of damages, if any, for the accused products Genius sent directly to the United States, and resolution of the fact dispute for the two lenses previously identified.  By **April 6, 2015**, the parties are to submit a joint notice identifying all other motions and pretrial filings currently pending before the Court can be terminated in light of this order.  The parties are to include in the joint notice a short and plain statement proposing how they would like to proceed for the remainder of the case.  Pending further direction from the Court, all current pretrial and trial dates are **vacated**.

**IT IS SO ORDERED**.

Dated: March 31, 2015

_____
JAMES DONATO
United States District Judge